**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **In re:** § | **CHAPTER 11 CASE** | |
| § | | |
| **ASSURED PHARMACY, INC.** § | **CASE NO. 15-40389** | |
| § | **(Joint Administration Pending)** | |
| Debtor. § | | |
| **In re:** § | | |
| § | **CHAPTER 11 CASE** | |
| **ASSURED PHARMACY MANAGEMENT, INC.** § | **CASE NO. 15-40399** | |
| § | | |
| Debtor. § | | |
| **In re:** § | **CHAPTER 11 CASE** | |
| § | | |
| **ASSURED PHARMACY DALLAS, INC.** § | **CASE NO. 15-40391** | |
| § | | |
| Debtor. § | | |
| **In re:** § | **CHAPTER 11 CASE** | |
| § | | |
| **ASSURED PHARMACY GRESHAM, INC.** § | **CASE NO. 15-40393** | |
| § | | |
| Debtor. § | | |
| **In re:** § | **CHAPTER 11 CASE** | |
| § | | |
| **ASSURED PHARMACY KANSAS, INC.** § | **CASE NO. 15-40394** | |
| § | | |
| Debtor. § | | |
| **In re:** § | **CHAPTER 11 CASE** | |
| § | | |
| **ASSURED PHARMACIES, INC.** § | **CASE NO. 15-40395** | |
| § | | |
| Debtor. § | | |
| **In re:** § | **CHAPTER 11 CASE** | |
| § | | |
| **ASSURED PHARMACY NORTHWEST, INC.** § | **CASE NO. 15-40397** | |
| § | | |
| Debtor. § | | |
| **In re:** § | **CHAPTER 11 CASE** | |
| § | | |
| **ASSURED PHARMACY BOSTON, INC.** § | **CASE NO. 15-40390** | |
| § | | |
| Debtor. § | | |

| | |
|---|---|
| In re:<br><br>**ASSURED PHARMACY DENVER, INC.**<br><br>Debtor. | §§§§§§ **CHAPTER 11 CASE**<br><br>**CASE NO. 15-40392** |
| In re:<br><br>**CS COMPLIANCE GROUP, INC.**<br><br>Debtor. | §§§§§§ **CHAPTER 11 CASE**<br><br>**CASE NO. 15-40398** |

**MOTION FOR INTERIM AND FINAL
AUTHORITY FOR THE DEBTORS TO USE CASH
COLLATERAL, OBTAIN DEBTOR IN POSSESSION FINANCING, AND
DETERMINING ADEQUATE PROTECTION, SUPERPRIORITY CLAIMS AND LIENS**

Assured Pharmacy, Inc. ("Assured" or the "Debtor") and its wholly owned subsidiaries,[1] the debtors and debtors-in-possession (collectively, the "Debtors") in the above captioned cases (the "Cases"), hereby file this *Motion For Interim and Final Authority to Use Cash Collateral, Obtain Debtor in Possession Financing, and Determining Adequate Protection, Superpriority Claims and Liens* (the "Motion"), and would show as follows:

### I. PRELIMINARY STATEMENT

1.  The Debtors are engaged in the business of establishing and operating pharmacies that specialize in highly regulated pain medication for chronic pain management. The Debtors' revenue is derived primarily from sale of prescription medications, the majority of which comes from repeat customers. A more complete description of the Debtors' operations and history is set forth in the *Declaration of Brett Cormier in Support of First Day Motions*, filed contemporaneously with this Motion. To continue their operations in an orderly manner on a post-petition basis, the Debtors need immediate authority to borrow funds pursuant to a loan

---

[1] The subsidiaries comprise Assured Pharmacy Management, Inc., Assured Pharmacy Dallas, Inc., Assured Pharmacy Gresham, Inc., Assured Pharmacy Kansas, Inc., Assured Pharmacies, Inc., Assured Pharmacy Northwest, Inc., Assured Pharmacy Boston, Inc., Assured Pharmacy Denver, Inc. and CS Compliance Group, Inc. (collectively, the "Subsidiaries").

agreement negotiated with Precise Analytical, LLC ("Precise" or the "DIP Lender"), which is also the proposed purchaser of the new equity to be issued under the Debtors' proposed plan. The Debtor intends to borrow enough funds to operate in the ordinary course of business during these bankruptcy Cases.

2.   Before the commencement of these cases, the Debtors utilized a revolving credit facility from Third Coast Bank SSB ("Third Coast") under which Third Coast would "purchase" or otherwise finance the Debtors' accounts receivable and advance funds to the Debtors, which the Debtors would pay back to Third Coast upon collection of the applicable accounts receivable, with a service charge paid to Third Coast.  As of March 5, 2015 (the "Petition Date"), the outstanding obligations to Third Coast under the pre-petition loan agreements are approximately $700,000.  Such obligations are purportedly secured by certain purchased accounts receivable, which, as of the Petition Date, were valued at approximately $1.3 million, in the aggregate, of receivables which the Debtors believe are collectible.[2]  As discussed below, the Debtors intend to continue collecting accounts receivable (generated pre- and post-petition) and remitting payments to Third Coast from the Debtors' post-petition funds, including Third Coast's cash collateral, pursuant to the Budget (defined below), until Third Coast has received the full value of its pre-petition "purchased" accounts receivable or the undisputed pre-petition debt, which ever amount is less.[3]

3.   To obtain the requested credit, the Debtors proposes to execute the *Senior Secured Super-Priority Debtor-in-Possession Promissory Note* (the "DIP Note") in substantially

---

[2] The Debtors, as debtors-in-possession, reserve the right to investigate further the respective rights of the Subsidiaries and Third Coast in the applicable accounts receivable.  For purposes of this Motion, the Debtors describe the assets and liabilities generally for informational purposes only, but without prejudice to any rights the Debtors may have to determine the validity and extent of any party's interest in such assets.

[3] The Debtors reserve the right to seek a judicial determination of Third Coast's allowed secured claim and the value of its collateral at or prior to a final hearing on this Motion in the event that the parties cannot reach agreements.

the same form as the DIP Note attached hereto as **Exhibit A**.  Under the DIP Note, the Debtors would agree (and hereby propose) to grant to the DIP Lender: (i) a superpriority administrative claim for advances made under the DIP Note (subject only to the Carve-Out Expenses defined therein), (ii) senior liens on all property of the estate, encumbered or unencumbered, except for Third Coast's "factored" accounts receivable, and further excluding chapter 5 causes of action; and (iii) allowance of a Transaction Termination Fee (discussed below) to be allowed as an administrative expense upon the occurrence of a Termination Event (as defined in the DIP Note).  H.D. Smith Wholesale Drug Co. ("HD Smith") is the Debtors' only pre-petition secured creditor other than Third Coast, and HD Smith has consented to the granting of a senior lien to DIP Lender.

4.   The Debtors anticipate needing $750,000.00 in new financing during the first week these Cases, and $1,500,000.00 in total financing prior to the anticipated confirmation of the pre-negotiated plan.  The DIP Lender has agreed to advance such funds on the terms set forth in the DIP Note, and as summarized below.

## II. JURISDICTION AND VENUE

5.   The Debtors commenced the cases by filing petitions for relief on August 1, 2011.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. sections 1334 and 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D)and (M).  Venue is proper in the Sherman Division of the Eastern District of Texas as the Debtors are headquartered in Plano, Collin County, Texas.

## III. BACKGROUND

*The Debtors*

6. Assured was first organized as a Nevada corporation on October 22, 1999, under the name of Surforama.com. It later changed its name to eRXSYS, Inc. and subsequently to Assured Pharmacy, Inc. in October 2005. Since May 2003, Assured has been engaged in the business of establishing and operating pharmacies that specialize in highly regulated pain medication for chronic pain management. Because its focus is on dispensing medication, Assured typically does not keep in inventory non-prescription drugs, or health and beauty related products, such as walking canes, bandages and shampoo. The company's revenue is derived primarily from the sale of prescription medications, the majority of which comes from repeat customers.

7. Assured's pharmacies maintain a variety of drugs, known as Schedule II, Schedule III and Schedule IV drugs. Schedule II drugs are considered narcotics by the United States Drug Enforcement Administration ("DEA"), and are the most addictive, hence they are highly regulated by the DEA and are required to be segregated and secured in a separate cabinet. Schedule III and Schedule IV drugs are less addictive and are less regulated. Because Assured's business model focuses on servicing pain management physicians and their patients with chronic pain, Assured strives to maintain larger amounts of Schedule II drugs than most "big box" pharmacies.

8. The Debtors' business goals had been to develop a national footprint as a premier provider of pharmacy services to physicians and patients primarily in the treatment of chronic pain. Management of the Debtors had developed and refined what it believed to be a unique pharmacy service model for chronic pain physicians and patients that was capable of being

scaled into a national chain. The Debtors intended to scale their business up to four additional pharmacies per year for a total of 12 pharmacies nationwide, subject to their ability to secure the requisite financing. By August 2013, management developed and implemented a plan to scale back operations until operations and financing were such that the company could take advantage of its unique model and expansion goals.

9. Currently, the Debtors operate three pharmacies—in Kirkland, Washington; Leawood, Kansas; and Greenwood Village, Colorado. Previously, the Debtors also operated pharmacies in Riverside, California and Gresham, Oregon, but management decided to close those pharmacies in August 2013, to preserve the Debtors' going concern until new capital became available to fund the Debtors' plans for expansion.

*Capital and Debt Structure*

10. The Debtors' total creditor liabilities as of the Petition Date are approximately $8.3 million, plus additional equity investments of more than $10.5 million. The Debtors' total trade debt as of the Petition Date is approximately $1.1 million, most of which (approximately 75%) was more than 90 days overdue. Notwithstanding these large trade payables, the Debtors have remained on good terms with their critical suppliers. The Debtors do not anticipate that there will be significant reclamation or 503(b)(9) claims in these Cases, because the Debtors have generally paid most of their critical suppliers for goods supplied in the period leading up to the Petition Date. Further, the Plan proposed herein would pay such trade claims in full, regardless of their entitlement to administrative priority. One of the Debtors' largest suppliers is HD Smith. Over time, the Debtors fell far behind in payments to HD Smith to the tune of over $4 million. In an effort to resolve the delinquency and avoid collection efforts by HD Smith, in August, 2011, the Debtors agreed to combine the outstanding account balances into a single note,

and granted HD Smith a security interest in their assets to secure the Debtors' obligations to HD Smith.

11. In addition to the Debtors' trade debt, as discussed above, the Debtors have factored their accounts receivable with Third Coast. As of the Petition Date, the Debtors owed approximately $700,000 to Third Coast, which amounts are secured by the accounts receivable sold or factored with Third Coast pre-petition. As of the Petition Date, the Debtors anticipate that such pre-petition receivables will generate post-petition collections of approximately $1.3 million, much of which should be collected over the course of the first 30 days in these Cases. HD Smith agreed to subordinate its security interests in the Debtors' assets to Third Coast's interests in such accounts.

12. The Debtors have issued convertible debentures to four different entities, for a total outstanding obligation of approximately $1.9 million. Some of those debentures matured in 2012, and are accruing interest. In addition to the revolving credit facility with Third Coast and convertible debentures, the Debtors have borrowed money, as needed, from various related and unrelated parties such as Robert DelVecchio (the Debtors' President and CEO), and Pinewood Trading Fund, LP, a preferred stock holder. In all, these related and unrelated parties are owed $1.2 million.

13. Additionally, three of the Debtors' executives have agreed to defer significant portions of their compensation until the effective date of a plan to help the Debtors get through a successful reorganization. In all, such executives have deferred $620,000.00 of their earned salaries, which the Debtors propose to pay pursuant to a confirmed plan.

14. Finally, the Debtors borrowed approximately $400,000 from HD Smith and Hillair Capital in the weeks leading up to the Petition Date as bridge financing to have the capital

necessary to pay for operations and bankruptcy-related expenses. Those amounts were used to pay operating expenses and legal fees prior to filing the petitions, and will be repaid in full from the sale proceeds derived from the Purchase Agreement, upon closing.

15.     The more than $10 million in equity interests are more specifically described as follows. The Debtors have issued 2,329 shares of Series D Preferred Stock, which have a conversion price of $.50 per share to approximately 4,858,000 shares of Common Stock. In all, the Debtors' estimated the obligations to such holders to be approximately $2,548,303. The Debtors have also issued 813 shares of Series C Preferred Stock (convertible to 902,778 shares of Common Stock, at a conversion price of $.90 per share), and 1,466 shares of Series A Preferred Stock (convertible to 1,629,006 shares of Common Stock, most of which was issued with a conversion price at $.90 per share). These two series vote together and have an equal liquidation preference to each other, but lower than Series D holders. Finally, the Debtors have issued approximately 5,124 shares of Series B Preferred Stock (convertible to 5,776,667 shares of Common Stock, at a conversion price of $.90 per share). In all, there are 9,832 shares of preferred stock, and 13,353,294 shares of common stock issued and outstanding. The last offering in 2013 valued such shares at $.40 per share, although more recent trades on the over-the-counter market have shown lower market prices, as noted in the Cormier Declaration.

### IV. RELIEF REQUESTED

16.     By filing this Motion, the Debtors respectfully request authorization to enter into post-petition financing agreements, substantially in the form of the agreement attached as **Exhibit A**, with the DIP Lender on the terms summarized below:

    (a)    <u>Advances for Operations</u> – The DIP Lender will agree to advance $750,000.00 on an interim basis, and up to $1,500,000.00 on a final basis.

(b) <u>Budgeted Use of Funds</u> – The Debtors will use such funds pursuant to the budget attached as **Exhibit B** (the "<u>Budget</u>"). The attached Budget identifies the Debtors' proposed expenses to be incurred and paid during the bankruptcy Cases, including payroll, inventory purchases, bankruptcy professionals, and anticipated payments to Third Coast. The Budget includes a Carve-Out to pay professionals of the Debtors and any statutory committee that may be appointed in these Cases. The DIP Lender's liens and superpriority claims will be subordinate to such Carve-Out Expenses (as defined in the DIP Note). Unless the DIP Lender consents in writing to the contrary, the Debtors must comply with all line-items in the Budget, within 10% on a weekly basis, and 15% on an aggregate basis.

(c) <u>Collateral</u> – The DIP Note defines "Collateral" to be all of the Debtors' assets, including without limitation all accounts (except those purchased by Third Coast before the Petition Date), chattel paper, commercial tort claims, deposit accounts and securities accounts, documents, equipment, fixtures, general intangibles, goods, intellectual property, instruments, inventory, investment property, leases, all letters of credit, letter of credit rights, and other supporting obligations, all money, cash and cash equivalents, tax refunds and tax credits, all products and proceeds of any of the foregoing, including all insurance proceeds payable for the loss, damage or destruction of any of the foregoing provided, however, that "Collateral" shall exclude any avoidance and recovery actions under Chapter 5 of the Bankruptcy Code.

(d) <u>Priming Liens</u> – The DIP Lender's liens will be senior to any other party in interest. The only known parties who may assert security interests in the parts of the Collateral are HD Smith (who consents to such priming liens) and, potentially, Third Coast. However, as to Third Coast, the proposed Collateral for advances made under the DIP Note will *not* seek to prime Third Coast as to any accounts receivable that Third Coast purchased before the Petition Date.

(e) <u>Interest</u> – Interest will accrue at a rate of 10% per annum and, upon default, 15% per annum, and will be paid (pursuant to the Budget) on the first day of each month.

(f) <u>DIP Lender's Fee</u> – The Debtors will agree to pay DIP Lender a fee equal to 2% of the principal amount of the DIP Note, which shall be fully earned and due and payable upon execution of the DIP Note. Such fee may be paid from the proceeds of the advances made under the DIP Note.

(g) <u>Approval of a Transaction Termination Fee</u> – Because the DIP Note and loans advanced thereunder are provided as part and parcel of the Equity Purchase Agreement (the "<u>Purchase Agreement</u>"), which is proposed as part of the Debtors' chapter 11 plan of reorganization, the DIP Lender and

the Debtors have negotiated, as part of the DIP Note, to provide a fee to the DIP Lender in the amount of $460,000.00 (the "Transaction Termination Fee"), to be allowed immediately as an administrative expense in these Bankruptcy Cases, and payable in the event that the Debtors elect not to consummate the Purchase Agreement with the Purchaser or fail to proceed toward confirmation on the schedule contemplated under the DIP Note. As set forth in the DIP Note, the terms upon which the Transaction Termination Fee would become payable are set forth more fully in Section 8.5 of the Purchase Agreement. That provisions provides, among other things, that "no Transaction Termination Fee shall be earned or payable whatsoever if the Closing occurs, notwithstanding any breaches of any covenants or any other breaches by the [Debtors] under this [Purchase] Agreement." By this Motion, the Debtors seek express approval of this term of the DIP Note and Purchase Agreement.

(h) Superpriority Claim for Advances – The DIP Lender will receive a superpriority claim for the advances made under the DIP Note, which will be paid on the effective date of a plan, and subject only to the Carve-Out Expenses (defined under the DIP Note).

(i) Schedule for Confirmation – The Debtors will obtain approval of a disclosure statement within 30 days of the Petition Date, confirmation of the plan 30 days thereafter, and effectiveness of such plan within 15 days thereafter. The plan must be acceptable to the DIP Lender.

(j) Maturity Date – The Debtors' obligations under the DIP Note will be payable on demand of the DIP Lender, or upon the Maturity Date, which will be 90 days after the Petition Date, unless extended in writing by the DIP Lender.

(k) Events of Default - The list of events of default are set forth in Section 7 of the DIP Note, but include failure to make payments to the DIP Lender as required under the DIP Note, dismissal or conversion of the Cases, appointment of a trustee, allowance of a surcharge against the DIP Lender, failure to obtain confirmation on the schedule required under the DIP Note or confirmation of a plan that is not acceptable to the DIP Lender, and failure to obtain approval of the Transaction Termination Fee.

17. The Debtors further seek permission from this Court to use cash collateral, as set forth in the Budget, to fund ongoing operations, including payments to Third Coast in satisfaction of its pre-petition secured claim. The Debtors believe the payments of the collections on Third Coast's prepetition "factored" accounts receivable are sufficient to

adequately protect Third Coast's interests in such collateral, and, thus, the Debtors seek a determination of this Court that no further form of adequate protection is required.

18. By separate motion filed contemporaneously with this Motion, the Debtors are seeking authority to continue using their existing cash management system. Third Coast claims a security interest in one of the Debtors' operating accounts held at Third Coast Bank. However, the Debtors' existing customers, insurance companies and government payors are already programmed to remit payments to those accounts, and, on belief, asking the Debtors' customers and account debtors to remit future payments to new accounts could threaten to delay payment on new invoices for 30-60 days. Rather than causing this cash flow crisis unnecessarily, the Debtors seek to continue using their existing deposit accounts (in which Third Coast claims a security interest), even though the funds to be deposited into them post-petition will be (i) payments on pre-petition accounts receivable (purportedly purchased by Third Coast); and (ii) payments on post-petition accounts receivable (not subject to Third Coast's liens). Pursuant to a separate motion filed contemporaneously with this Motion, Debtors are seeking to continue using their existing bank accounts, which include a remission account at Third Coast. Pursuant to the relief requested in that separate motion, Third Coast will retain and apply to its secured claim the payments made from collections attributable to Third Coast's pre-petition "factored" accounts receivable, but Third Coast must remit or otherwise allow the Debtors to transfer other amounts into the Debtors' depository accounts at other financial institutions to be used pursuant to the Budget and the orders granted on this Motion.

19. A proposed form of order granting the requested relief is attached as **Exhibit C**. This draft order has not yet been agreed to by Third Coast. Based on discussion to date, the Debtors believe that the DIP Lender is willing to fund pursuant to the DIP Note, and that the

junior lien holder HD Smith will consent to the priming liens and use of cash collateral consistent with the budget.

## V. ARGUMENTS AND AUTHORITY

*Cash Collateral and Adequate Protection*

20. Section 363(c) of the Bankruptcy Code provides that a debtor-in-possession may use cash collateral if all interested entities consent or the court, after notice and a hearing, authorizes such use. Section 363(e) of the Bankruptcy Code requires that the use of cash collateral be prohibited or conditioned as is necessary to provide adequate protection to persons that have an interest in cash collateral. *In re DeSardi*, 340 B.R. 790, 797 (Bankr. S.D. Tex. 2006) ("Adequate protection is . . . grounded in the belief that secured creditors should not be deprived of the benefit of their bargain"). Read together, sections 363(c) and (e) of the Bankruptcy Code authorize a debtor-in-possession to use the cash collateral of a secured creditor if such creditor's collateral is adequately protected. *See In re Harrington & Richardson, Inc.*, 48 B.R. 431, 433 (Bankr. D. Mass. 1985) (finding that the court may authorize the use of cash collateral upon a showing that those with an interest in the cash collateral are adequately protected).

21. Although the term "adequate protection" is not precisely defined in the Bankruptcy Code, section 361 sets forth three non-exclusive examples of what may constitute adequate protection: (1) periodic cash payments equivalent to the decrease in value of the creditor's interest in the property; (2) an additional or replacement lien on other unencumbered property of the debtor; or (3) other relief that provides the indubitable equivalent of the creditor's property interest. *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 793 F.2d 1380, 1388 (5th Cir. 1986). "[T]he debtor-in-

possession has the burden of proof on the issue of adequate protection." *In re Cafeteria Operators, L.P.*, 299 B.R. 400, 406 (Bankr. N.D. Tex. 2003).

22. Third Coast's interests in the accounts receivable are "adequately protected" within the meaning of section 361 and "preserved" within the meaning of section 506(c) because all collections on Third Coast's "factored" accounts receivable will be paid to Third Coast pursuant to the Budget to reduce Third Coast's secured claim, and the Budget and AR aging reports show that the Debtors will have the ability to pay down the obligations to Third Coast during the first 30 days of the bankruptcy Cases significantly, if not entirely. Thus, the continued operations of the Debtors, with financing from the DIP Lender, is beneficial to Third Coast and requires no further form of adequate protection.

23. Bankruptcy Rule 4001(b) permits a court to approve use of cash collateral during the 15-day period following the filing of a motion only to the "extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Here, the Debtors require immediate access to the cash collateral to, among other things, fund any interim obligations while DIP financing is forthcoming.

24. Accordingly, the Debtors request that the Court authorize the Debtors to immediately use the cash collateral in the amounts set forth in the Budget, pending a final hearing. At the final hearing, the Debtors request that the relief requested herein be granted on a permanent basis, at which time the Debtors hope to have resolved any disputes regarding ownership and values of pre-petition accounts receivable and amounts owed to Third Coast.

*DIP Financing, Liens and Superpriority Claims*

25. The DIP Lenders are willing to provide bridge financing to the Debtors to enable the Debtors to operate during these bankruptcy Cases, but only on the terms described in this

Motion and more fully in the DIP Note. The Debtors have managed to obtain interim financing from its suppliers and related parties pre-petition, but they are unwilling to continue making advances post-petition. Based on management's efforts, they have concluded that the DIP Note is the only means of obtaining the amount of capital necessary to operate the Debtors' business for the next 30-45 days while the Debtors seek confirmation and consummation of the plan.

26. Section 364(c)&(d) authorizes the Debtors to incur debt post-petition as requested herein. If a debtor-in-possession is unable to obtain unsecured credit allowable as an administrative expense, and the Debtors demonstrate that the to-be-subordinated creditors are adequately protected, the Bankruptcy Code authorizes such debtor-in-possession to incur debt secured by priming liens. *See* 11 U.S.C. § 364(d)(1). Here, the Debtors are attempting to reorganize through a plan that will ultimately transfer ownership to Precise, or its assigns. While the Debtors have been able to obtain bridge loans from suppliers and related parties pre-petition, they are no longer willing to finance the Debtors' operations. Under the circumstances, the Debtors have concluded that DIP Lender is the only party willing to finance the Debtors' operations in the amounts necessary to complete their reorganization. Moreover, HD Smith—the only secured creditor impacted by the priming liens granted to DIP Lender—consents to such priming liens. While the Debtors do not believe Third Coast is being primed by such liens (because Third Coast has no lien on post-petition receivables), Third Coast is adequately protected by the payments proposed under the Budget, that should pay down or pay off entirely Third Coast's secured claim or ownership during the first 30 days of these Cases. On these facts, the relief requested is warranted.

*Transaction Termination Fees*

27. Termination fees and expense reimbursements are often used to encourage potential purchasers of assets to invest the requisite time and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. Historically, bankruptcy courts have approved such fees under the "business judgment rule," which discourages judicial second-guessing of decisions made in good faith and in the exercise of honest judgment by a corporation's board of directors. *In re Integrated Res., Inc.*, 147 B.R. 650, 657-58 (Bankr. S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). Other bankruptcy courts, however, have taken broader or more stringent approaches.

28. The Third Circuit has articulated the relevant inquiry as whether such a termination fee would be allowable as administrative expenses, i.e. such fees are actually necessary to preserve the value of the estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc.* (*In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527, 537 (3d Cir. 1999); *In re Women First Healthcare, Inc.*, 332 B.R. 115, 120-21 (Bankr. D. Del. 2005) (applying standard set forth in *O'Brien Envtl.*); *see also, In re Phila. Newspapers, LLC*, 2009 Bankr. LEXIS 3167 (Bankr. E.D. Pa. Oct. 8, 2009); *In re President Casinos, Inc.,* 314 B.R. 786, 789 (Bankr. E.D. Mo. 2004); *In re Twenver, Inc.,* 149 B.R. 954, 956-57 (Bankr. D. Col. 1992).

29. While this Court has not adopted either approach, it has approved break-up fees in this range in the past. *See, e.g., In re Physicians Specialty Hospital of El Paso East, L.P.,* Case No. 07-30633-lmc, Doc. No. 194 (Bankr. W.D. Tex. Sept. 26, 2007) (approving a break-up fee and expense reimbursements up to 1% of the purchase price, in the aggregate); *see also In re TXCO Resources, Inc.,* Case No. 09-51807-rbk, Doc. No. 813 (Bankr. W.D. Tex. Nov. 30, 2009)

(approving a 3% break-up fee). A break-up fee that constitutes a fair and reasonable percentage of the proposed purchase price and that is reasonably related to the risk, effort, and expenses of the prospective purchaser is generally permissible.

30. As noted in the Cormier Declaration, the DIP Note and the Purchase Agreement between the Debtors and the DIP Lender—the backbone of the Debtors' proposed plan of reorganization—were negotiated as a "packaged deal." Given the amount of time the DIP Lender has spent towards conducting due diligence, negotiating, and documenting the proposed transaction, and the associated costs incurred by the DIP Lender through its attorneys, advisors and consultants over the past seven months, the Transaction Termination Fee was a critical component of the DIP Lender's willingness to fund the Debtors' chapter 11 process while exposing the DIP Lender to the risk that the Debtors would be compelled to consider alternative transactions. Importantly, as noted above, the Transaction Termination Fee is payable only if the Debtors decide not to consummate the proposed transaction with the DIP Lender (through their bargained-for "fiduciary out") or in the event certain events of default have occurred.

31. Indeed, the Debtors have used their best efforts to negotiate with the DIP Lender to ensure that the Transaction Termination Fee is reasonably designed to: (a) induce the DIP Lender to tie up cash for a substantial period of time, in lieu of using such liquidity to pursue other opportunities, while exposing itself to the risk the Debtors pursue an alternative transaction and terminate the Purchase Agreement; and (b) compensate the DIP Lender for the cost, time and effort spent negotiating the entire transaction with the Debtors in the event such alternative transaction is pursued. The Debtors contend that such Transaction Termination Fee in the amount of $460,000.00, which is roughly 4% of the total $11.5 million purchase price contemplated under the current transaction proposed under the plan, satisfies these goals, is a

critical component of the Debtors' entire restructuring plan, is reasonable and appropriate under the facts and circumstances of these cases, and should be approved by the Court.

## VI. NOTICE

32. Notice of this Motion has been provided to: (a) the U.S. Trustee; (b) Third Coast; (c) HD Smith; (d) counsel for the DIP Lender; (e) the Debtors' thirty (30) largest unsecured creditors, on a consolidated basis; (f) those persons who have formally appeared and requested notice in this case pursuant to Bankruptcy Rule 2002; and (g) the Internal Revenue Service and other governmental entities required to receive notice under the Bankruptcy Rules or the Local Rules. The Debtors submit that no other or further notice need be provided.

## VII. PRAYER

WHEREFORE, the Debtors respectfully request that this Court enter an Order in substantially the same form as the order attached hereto as **Exhibit C**: (i) authorizing the Debtors to execute the DIP Note and borrow and use funds from the DIP Lender on the terms set forth herein; (ii) granting to the DIP Lender liens and superpriority claims set forth herein; (iii) approving the Transaction Termination Fee in the amount and on the terms specified herein; (iv) authorizing the Debtors to use cash collateral of Third Coast and HD Smith, provided that the Debtors make payments to Third Coast as set forth in the Budget; (v) determining that the Debtors need not provide further adequate protection to Third Coast, HD Smith or any other creditor or party in interest; (vi) granting such relief on an interim basis, and after a final hearing, on a permanent basis; and (v) granting such other and further relief as is just and proper.

Dated: March 5, 2015          Respectfully submitted,

**COX SMITH MATTHEWS INCORPORATED**
1201 Elm Street, Suite 3300
Dallas, Texas 75270
(214) 698-7800
(214) 698-7899 (Fax)

By:  */s/ Aaron M. Kaufman*
     George H. Tarpley
     State Bar No. 19648000
     gtarpley@coxsmith.com
     Aaron M. Kaufman
     State Bar No. 24060067
     akaufman@coxsmith.com

**PROPOSED ATTORNEYS FOR DEBTORS AND DEBTORS-IN-POSSESSION**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been served this 5th day of March, 2015 either (1) electronically by the Court's PACER system, (2) electronically by email or fax transmission (as noted on the service list), and/or (3) by Federal Express Overnight Delivery or United States Postal Service Priority Overnight Mail, postage prepaid, to the parties on the attached list. Copies of the documents were also published on the following website: http://info.coxsmith.com/Assured_Pharmacy.html.

                               */s/ Aaron M. Kaufman*
                               Aaron M. Kaufman