## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASSURED PHARMACY, INC., et al.,[1] | ) | Case No. 15-**40389** |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### [PROPOSED] DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**Nothing contained herein shall constitute an offer, acceptance, or a legally binding obligation of the Debtors or any other party in interest and this Plan is subject to approval by the Bankruptcy Court and other customary conditions. This Plan is not an offer with respect to any securities. YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

George H. Tarpley
TBA 19648000
Aaron M. Kaufman
TBA  24060067
**COX SMITH MATTHEWS INCORPORATED**
1201 Elm Street, Suite 3300
Dallas, Texas  75270
Telephone:          (214) 698-7800
Facsimile:          (214) 698-7899

*Counsel to Debtors and Debtors in Possession*

Dated:  March 5, 2015

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Assured Pharmacy, Inc. (98-0233878); Assured Pharmacy Management, Inc. (27-1236523); Assured Pharmacy Dallas, Inc. (47-1936619); Assured  Pharmacies, Inc. (20-0039751); Assured Pharmacy Boston, Inc. (46-1053319); Assured  Pharmacy Denver, Inc., (46-1067028); Assured Pharmacy Gresham, Inc. (20-5276969); Assured Pharmacy Kansas, Inc. (45-2800373); CS Compliance Group, Inc. (27-4603528); and Assured Pharmacies Northwest, Inc. (20-0500854).  The location of parent Debtor Assured Pharmacy, Inc.'s corporate office and the service address used for all Debtors is: 5600 Tennyson Parkway, Suite 390, Plano, Texas 75024.

THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" AS DEFINED IN SECTION 1125(A) OF THE BANKRUPTCY CODE FOR USE IN SOLICITATION OF ACCEPTANCES OR REJECTIONS OF A CHAPTER 11 PLAN.   THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT ARE NOT INTENDED TO BE, AND SHOULD NOT IN ANY WAY BE CONSTRUED AS, A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED IN THIS PROPOSED DISCLOSURE STATEMENT BE RELIED UPON FOR ANY PURPOSE BEFORE THE BANKRUPTCY COURT DETERMINES THAT THE PROPOSED DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND THE CONDITION OF THE DEBTORS' BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL INVESTOR OR CREDITOR OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN. THE DEBTORS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT AT ANY TIME BEFORE THE HEARING TO CONSIDER WHETHER THE SAME CONTAINS "ADEQUATE INFORMATION" AND AUTHORIZE THE SOLICITATION OF ACCEPTANCES AND REJECTIONS OF THE PLAN.

A SEPARATE NOTICE OF HEARING WILL BE SERVED BY THE DEBTORS TO NOTIFY PARTIES IN INTEREST OF THE DATE AND TIME SCHEDULED FOR A HEARING ON THE APPROVAL OF THIS PROPOSED DISCLOSURE STATEMENT.

# TABLE OF CONTENTS

I.     LEGAL DISCLOSURES .................................................................................................1

II.    OVERVIEW OF THE PLAN .......................................................................................2

III.   BACKGROUND OF THE DEBTOR .........................................................................3

     A.   About the Debtors...............................................................................................3

     B.   The Debtors' Operations and Assets ................................................................3

     C.   Significant Debts ................................................................................................4

     D.   Events Leading to the Bankruptcy Filing .........................................................5

IV.   SIGNIFICANT EVENTS DURING THE BANKRUPTCY ....................................6

     A.   Pre-Negotiated Plan and Proposed Schedule for Confirmation.........................6

     B.   First Day Motions and Debtor-in-Possession Financing ..................................7

V.    SUMMARY OF TREATMENT UNDER THE PLAN...............................................7

     A.   Unclassified Claims ..........................................................................................7

     B.   Classes and Proposed Treatment ......................................................................8

VI.   MEANS OF IMPLEMENTATION OF THE PLAN.................................................12

     A.   Vesting of Assets (The Reorganized Debtors vs. the Plan Administrator).......12

     B.   The Purchase Agreement ..................................................................................12

     C.   Management of the Reorganized Debtors Under the Plan; Plan Administrator .................................13

     D.   Executory Contracts and Unexpired Leases .....................................................13

     E.   Powers of the Plan Administrator .....................................................................14

     F.   Administration of Claims and the Plan Administrator.......................................14

     G.   Estate Causes of Action ....................................................................................14

     H.   Releases under the Plan .....................................................................................15

     I.   Discharge of Debts and Injunctions .................................................................15

VII.   VOTING PROCEDURES..........................................................................................16

     A.   Deadline for Submission of Ballots and Objections to Confirmation................16

     B.   Creditors Solicited to Vote ...............................................................................16

VIII.   EXPLANATION OF CHAPTER 11 .........................................................................17

     A.   Overview of Chapter 11 ....................................................................................17

     B.   Plan of Reorganization .....................................................................................17

     C.   Confirmation Requirements...............................................................................18

IX.   ALTERNATIVES TO CONFIRMATION................................................................19

     A.   Potential Liquidation Scenarios ........................................................................19

     B.   Effect of Confirmation on Taxes ......................................................................20

X.    CONCLUSION .........................................................................................................20

**[PROPOSED] DISCLOSURE STATEMENT IN SUPPORT OF
JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Assured Pharmacy, Inc., Assured Pharmacy Management, Inc., Assured Pharmacy Dallas, Inc., Assured Pharmacy Boston, Inc., Assured Pharmacy Denver, Inc., Assured Pharmacies, Inc., Assured Pharmacy Gresham, Inc., Assured Pharmacy Kansas, Inc., Assured Pharmacies Northwest, Inc.,  and CS Compliance Group, Inc., as debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors" or "Proponents") in the above-captioned chapter 11 cases pending before the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division (the "Bankruptcy Court") submit this *[Proposed] Disclosure Statement in Support of the Joint Chapter 11 Plan of Reorganization* (the "Disclosure Statement").  This Disclosure Statement is to be used in connection with the solicitation of votes on the *Joint Chapter 11 Plan of Reorganization* (the "Plan"), filed on March 4, 2015, in the above-referenced chapter 11 cases.  A copy of the Plan is attached hereto as Exhibit "A".  Unless otherwise defined herein, terms used herein have the meanings ascribed thereto in the Plan (see Article I of the Plan entitled "Definitions").

For a general summary of the proposed treatment of your Claim or Interest under the Plan, please see the chart below.

## I.      Legal Disclosures

This Disclosure Statement is provided to you by the proponents of the Plan, Assured Pharmacy, Inc., and its co-debtor Subsidiaries, to summarize key provisions of the Plan, including provisions relating to the Plan's treatment of Claim against, and Interests in, Assured and its Subsidiaries.  While the Debtors believe that the Disclosure Statement contains adequate information, as defined in section 1125(a) of the Bankruptcy Code, with respect to the information summarized herein, **HOLDERS OF CLAIMS AND INTERESTS SHOULD REVIEW THE ENTIRE PLAN AND EACH OF THE DOCUMENTS REFERENCED HEREIN AND SHOULD SEEK THE ADVICE OF THEIR OWN COUNSEL BEFORE CASTING THEIR BALLOTS.**

[THE BANKRUPTCY COURT HAS REVIEWED THIS DISCLOSURE STATEMENT, AND HAS DETERMINED THAT IT CONTAINS ADEQUATE INFORMATION AND MAY BE SENT TO YOU TO SOLICIT YOUR VOTE TO ACCEPT THE PLAN.]

The Debtors provide this Disclosure Statement solely for purposes of soliciting Holders of Claims and Interests to accept the Plan.  **THE CONTENTS OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN.**

Moreover, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation or waiver. The summary of the Plan and other documents described in this Disclosure Statement are qualified by reference to documents themselves and any exhibits thereto. The Debtors believe that the information herein is accurate but are unable to warrant that it is without any inaccuracy or omission.

Except for the information set forth in this Disclosure Statement, the Plan and any exhibits thereto, the Bankruptcy Court has not authorized the dissemination of any representations concerning the Debtors, their assets and liabilities, the past or future operations by the Debtors, the Plan or any alternatives to the Plan. **ACCORDINGLY, EXCEPT FOR THE INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS THERETO, ANY REPRESENTATION MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN IS UNAUTHORIZED AND SHOULD BE REPORTED TO THE DEBTORS.**

In the event of any inconsistency or discrepancy between a description contained in this Disclosure Statement and the terms and provisions of the Plan or the other documents or financial information incorporated herein by reference, the Plan or such other documents, as applicable, shall govern for all purposes.

To ensure compliance with Treasury Department Circular 230, each holder of a Claim or Interest is hereby notified that: (a) any discussion of U.S. Federal tax issues in this Disclosure Statement is not intended to be relied upon, and cannot be relied upon, by any holder for the purpose of avoiding penalties that may be imposed on a holder under the Tax Code; (b) such discussion is included hereby by the Debtors in connection with the promotion or marketing (within the meaning of Circular 230) by the Debtors of the transaction or matters addressed herein; and (c) each holder should seek advice based on its particular circumstances from an independent tax advisor.

## II.    Overview of the Plan

Parties are cautioned to read the Plan carefully to fully understand its terms. This section offers a summary of the Plan only, given in lay and non-technical terms, and is not to be construed as conclusive.

The Plan provides a means to consummate the Purchase Agreement with Precise Analytical, LLC (the "Purchaser"), resolve Claims against and Interests in the Debtors, and distribute all sale proceeds resulting from the Purchase Agreement and any other funds that may be available for distribution. This is a 100% plan. It provides for payment in full of all administrative, secured and general unsecured claims, unless holders agree to less favorable treatment. The Plan further provides for meaningful distributions to be made to certain of the Debtors preferred stock holders according to their agreed-upon liquidation preferences. Under the Plan, all existing Interests in the Debtors will be cancelled, and the Plan will issue new equity securities in Assured to the Purchaser and its assigns under the Purchase Agreement.

### III.   Background of the Debtor

**A.   About the Debtors**

Assured was first organized as a Nevada corporation on October 22, 1999, under the name of Surforama.com.  It later changed its name to eRXSYS, Inc. and subsequently to Assured Pharmacy, Inc. in October 2005.  Since May 2003, Assured has been engaged in the business of establishing and operating pharmacies that specialize in highly regulated pain medication for chronic pain management.  Because its focus is on dispensing medication, Assured typically does not keep in inventory non-prescription drugs, or health and beauty related products, such as walking canes, bandages and shampoo.  The company's revenue is derived primarily from sale of prescription medications, the majority of which comes from repeat customers.

Assured's pharmacies maintain a variety of regulated drug categories, known as Schedule II, Schedule III and Schedule IV drugs.  Schedule II drugs are considered narcotics by the United States Drug Enforcement Administration ("DEA"), and are the most addictive, hence they are highly regulated by the DEA and are required to be segregated and secured in a separate cabinet.  Schedule III and Schedule IV drugs are less addictive and are less regulated.  Because Assured's business model focuses on servicing pain management physicians and their patients with chronic pain, Assured strives to maintain larger amounts of Schedule II drugs than most "big box" pharmacies.

The Debtors' business goals was to develop a national footprint as a premier provider of pharmacy services to physicians and patients primarily in the treatment of chronic pain.  Management of the Debtors developed and refined what the Debtors believed to be a unique pharmacy service model for chronic pain physicians and patients that is capable of being scaled into a national chain.  The Debtors intended to scale their business up to four additional pharmacies per year for a total of 12 pharmacies nationwide, subject to their ability to secure the requisite financing.  However, since Assured's inception, the Debtors have struggled to obtain the financial capital to achieve the growth and scale necessary to realize the capabilities of the Debtors' business model. Thus, beginning approximately in August 2013, management developed and implemented a plan to scale back operations until operations and financing were such that the company could take advantage of its unique model and expansion goals.

For a more detailed description of the Debtors' history, operations, assets and liabilities, interested parties are invited to review the Debtors' most recently filed Form 10Q, which will be made available upon request to counsel for the Debtors.

**B.   The Debtors' Operations and Assets**

Currently, the Debtors operate three pharmacies—in Kirkland, Washington; Leawood, Kansas; and Greenwood Village, Colorado.  Previously, the Debtors also operated pharmacies in Riverside, California and Gresham, Oregon, but, management decided to close those pharmacies in August 2013, to preserve the Debtors' going concern until they could secure sufficient capital to fund the Debtors' plans for expansion.

The Debtors have attempted to restructure their books by making operational reductions to their staff, scaling down operations, and negotiating directly with their vendors and key

creditors.  Those efforts have proven helpful, but were still not enough to enable the Debtors to operate profitably.  Even with scaled down operations, the Debtors still required new sources of capital to meet their ordinary operating needs.  In July, 2014, management was approached by affiliates of the Purchaser and its capital advisors regarding a potential transaction that would provide the Debtors with the capital necessary to expand the Debtors' business to meet their business model and expansion goals.

## C.      Significant Debts

The Debtors' single largest  creditor is one of their suppliers H.D. Smith Wholesale Drug Co. ("HD Smith").  Over time, the Debtors' trade obligations to HD Smith accumulated to several millions of dollars, which the Debtors could not pay from their ordinary revenues.  In February, 2013, the Debtors executed a secured promissory note in favor of HD Smith to satisfy the balance then owed of approximately $3.8 million.  That note has since been extended and has accrued interest.  As of the Petition Date, the total due under this pre-petition secured note was approximately $4,130,000.00.  To secure this obligation, the Debtors have granted HD Smith liens on their personal property, including accounts receivable and inventory.

Another significant debt owed by the Debtors is pursuant to a factoring arrangement with Third Coast Bank SSB ("Third Coast").  Starting in March, 2014, the Debtors began "factoring" their accounts receivable with Third Coast under a $1.2 million Revolving Line of Credit Agreement.  As of the Petition Date, the Debtors owed approximately $700,000.00 to Third Coast under this loan, which is secured by first liens on the Debtors' pre-petition accounts receivable.  The Debtors estimate that the value of their pre-petition accounts receivable is at least $1.1 million, or more.

The Debtors are also indebted to their trade creditors in the aggregate amount of approximately $1.1 million as of the Petition Date.  Approximately 15% of that amount relates to invoices that were less than 90 days old as of the Petition Date.

In addition to unsecured trade debts, the Debtors have incurred various other unsecured obligations to various third parties, related parties and even insiders under promissory notes, bridge loans, and voluntarily reduced compensation pending consummation of a sale of the company, and other non-trade obligations.  In all, the Debtors estimate these "other" general unsecured debts total approximately $1.25 million, plus an additional $1.9 million of debts attributable to various convertible debentures issued by Assured.

## D.      Equity Transactions and Common Stock

Assured is registered with the Securities and Exchange Commission under File Number 001-35735, and its Common Stock is traded on the over the counter market under stock symbol APHY.  Assured has authorized the issuance of four separate classes of convertible preferred stock (Series A, B, C and D), each with its own voting and conversions rights, as well as liquidation preference.  The Debtors have also issued 13,353,294 shares of Common Stock.

According to the applicable certificates of designation filed with the Securities and Exchange Commission, Preferred Stock holders are entitled to liquidation preferences in the following order of preference:  Series D, Series A & C (pari passu), and Series B.  As of the

Petition Date, there were issued and outstanding: (i) 2,429 shares of Series D Preferred Stock (convertible to 4,858,800 shares of Common Stock); (ii) 1,466 shares of Series A Preferred Stock (convertible to 1,629,006 shares of Common Stock); (iii) 813 shares of Series C Preferred Stock (convertible to 902,778 shares of Common Stock); and (iv) 5,199 shares of Series B Preferred Stock (convertible to 5,776,667 shares of Common Stock). The Debtors estimate their total liabilities to holders of Preferred Stock to be over $10 million.

In the past year, the average share price for the Common Stock has been approximately $.1857 per share. Prices per share were highest at $.24-.25 per share in late November, 2014. However, the most recent trading activity, since January 13, 2015, has seen share prices decline below $.10 per share, and as low as $.04 per share as of the week ending February 27, 2015.[2]

### E.    Events Leading to the Bankruptcy Filing

In the months prior to the Petition Date, the Debtors were in need of new sources of capital, as existing revenues were insufficient to operate the Debtors' businesses without additional financing or investments from time to time. Moreover, the Debtors were unable to expand their businesses to take advantage of their unique, strategic business model and, instead, were forced to scale down their operations.

Management for the Debtors believe the Purchaser offers a unique opportunity for the Debtors for two main reasons. First, the Purchaser is affiliated with a toxicology company and, as such, would provide the Debtors with a strategic advantage in the market place. With the Purchaser's support, the Debtors will be able to offer their customers an end to end solution in toxicology and pharmacology. This offering does not currently exist in the market place. Second, the Purchaser's management has vast experience in the pharmacy space. That knowledge is very important because Purchaser's management already understands the Debtors' operational needs, thereby shortening the integration period of the two companies. Thus, the Debtors entered into an exclusivity agreement with the Purchaser's affiliates in October, 2014, and created a data room to allow the Purchaser and its affiliates and capital advisors to conduct due diligence of the Debtors. Ultimately, the Debtors have negotiated a transaction, subject to approval of this Court pursuant to the plan proposed herein, under which all old equity securities in Assured will be cancelled, and the Purchaser or its assigns will acquire all of the new equity securities of Assured. The Debtors will be able to use the proceeds from this transaction to pay administrative costs, claims and make distributions to Assured's existing owners.

Before the Petition Date, the Debtors contacted their key creditors and shareholders to negotiate terms of payment based on an anticipated sale of Assured's equity securities to a new investor. The Debtors also circulated plan support agreements to certain creditors and shareholders to determine what terms would be acceptable to such parties to ensure that the Sale Proceeds could be distributed in a fair and equitable manner that, in turn, would allow the proposed transaction to go forward with the support of key creditor and preferred stockholder groups. As of the Petition Date, the Debtors had received signed plan support agreements from HD Smith, Hillair Capital Investments, Pinewood Trading Fund, Mosaic, Andy Brown, Maggie Huang, Lisa Alexander, Stratcon Partners, Brockington Securities, Robert DelVecchio

---

[2] Average trade volumes are approximately 5,880 shares per trade since February 9, 2014. Since January 1, 2015, average volumes have declined to approximately 2,809 per trade.

and others.  The plan support agreements generally provide that these parties will support the plan, as long as the Plan treats the supporting parties' Claims and Interests on terms consistent with the agreements  With these parties' support, the Debtors anticipate that the Plan will have the necessary support to obtain confirmation by a wide margin.

No other solicitation materials have been circulated to creditors prior to the Bankruptcy Court's approval of this disclosure statement.  As set forth herein, the Plan provides for 100% payment of general unsecured claims.  The plan support agreements generally relate to the Preferred Stock holders' claims or interests that would be next in priority, although some of the holders of Preferred Stock also hold Secured Claims, Unsecured Claims and Common Stock. With these plan support agreements, absent unusual circumstances, the Debtors anticipate that all Classes of Claims and Interests that are impaired under the Plan and entitled to vote will accept the Plan by very significant margins, as the parties to the plan support agreements include the vast majority in dollar terms of the Preferred Stock interest and claims.  It is not anticipated that any funds will be available to make distributions on account of Common Stock.  All Equity Interests (including Preferred Stock, Common Stock and Other Interest) will be cancelled under the Plan.

With the support of the Purchaser and the Debtors' key creditors and Preferred Stock holders, the Debtors believe that this transaction can be consummated through the Plan, and the Plan Administrator will be able to make the distributions which were negotiated pre-petition. Management for the Debtors has spent a great deal of time negotiating with the Purchaser and the Debtors' key creditors and shareholders to ensure that the plan distributions are fair and equitable, and that the plan process may be quick and consensual among the Debtors' key constituents.  Likewise, the Purchaser has expended a significant amount of time and expense conducting its own due diligence and preparing to close the transaction contemplated in these Cases. These negotiations have been true third party, arm's length discussions. Subject to this Court's approval, the Purchaser has also agreed to advance up to $1,500,000.00 to the Debtors, as post-petition debtor-in-possession financing, which will be repaid from the Debtors' post-petition working capital and as a credit against the proposed $11.5 million purchase price.

## IV.    Significant Events During the Bankruptcy

### A.    Pre-Negotiated Plan and Proposed Schedule for Confirmation

The DIP financing and the proposed plan were negotiated as a package.  Thus, as discussed below, the Purchaser has requested—and the Debtors are seeking approval of—a transaction termination fee to be allowed as an administrative expense and paid in the event that the Debtors elect not to consummate the plan presently proposed or the transaction is terminated because of defaults by the Debtor, all as more specifically set forth in the DIP Note that is to memorialize the DIP financing.  The proposed termination fee is approximately 4% of the proposed purchase price.  Given the amount of time and expense the Purchaser has spent negotiating with the Debtors on the proposed transaction and the costs incurred by them through their attorneys, advisors and consultants over the past seven months during which this transaction has been in negotiations, the Debtors believe the transaction termination fee is reasonable. As noted in the proposed order approving the DIP financing, this transaction termination fee is payable only if the Debtors decide not to consummate the proposed transaction with the

Purchaser or if the Debtors have defaulted in such a manner that the Purchaser determines not to go forward with the transaction.  The Debtors have requested that this termination fee be approved in connection with the *Motion For Interim and Final Authority to Use Cash Collateral, Obtain Debtor in Possession Financing, and Determining Adequate Protection, Superpriority Claims and Liens* ("DIP Financing Motion").

**B.     First Day Motions and Debtor-in-Possession Financing**

As discussed in greater detail in the *Declaration of Robert DelVecchio in Support of First Day Motions*, the Debtors have filed a few "First Day Motions" seeking typical first-day relief to ensure the efficient administration of these bankruptcy cases.  Such relief included a request to administer these 10 cases jointly under the parent Assured's case heading.  The Debtors have also requested that these cases be designated as complex so that the Debtors may manage the service list and future hearings in a more efficient manner.

The DIP Financing Motion requests up to $1.5 million of post-petition financing from the Purchaser, which will be secured by first priority priming liens on all of the Debtors' assets except for those pre-petition accounts receivables that were factored by Third Coast.  Under the DIP Financing Motion, the Debtors proposed to collect pre-petition AR and use such funds to pay down the balance due to Third Coast (to reduce the interest, fees and other amounts to be paid to Third Coast at confirmation).  Meanwhile, the Debtors will stop factoring their AR through Third Coast and will use the new DIP Facility to purchase new inventory and build up new post-petition accounts receivable and other working capital to be used toward the Debtors' post-petition operations (subject to the Budget to be approved by the Purchaser and the Court).  Because the DIP Note is proposed as part of the Plan and related Purchase Agreement, the Debtors have proposed to pay the Purchaser, as the DIP Lender, a "Transaction Termination Fee" if the transaction does not close due to certain "Termination Events" as described more fully in the DIP Financing Motion and related DIP Note.  The Debtors do not anticipate that this fee will need to be paid, but if the fee is approved, it will simply compensate the Purchaser for its work in negotiating the transaction in the event that the Debtors do not consummate the transaction.

**V.     Summary of Treatment under the Plan**

**A.     Unclassified Claims**

The Bankruptcy Code precludes the Debtors from classifying certain claims under a Plan, such as certain Priority Tax and other Administrative Claims.   As described in greater detail in Article II of the Plan, those claims will be paid in full in Cash on the Effective Date, in the ordinary course of business, when such Claims become Allowed Claims or, for amounts owed under the Purchase Agreement, in accordance with the terms of the Purchase Agreement.

Specifically, Priority Taxes will be paid pursuant to section 1129(A)(9)(C) of the Bankruptcy Code.  However, as of the Petition Date, the Debtors were current on all known taxes including property, income, payroll and other taxes.

Professional Compensation Claims will be paid pursuant to Article II.C of the Plan, which provides for the establishment of a Professional Fee Escrow to be funded in amounts

sufficient to pay the accrued professional fees during the cases, and controlled by the Plan Administrator.  Professionals will have 60 days after the Effective Date to file final fee applications, and the Plan Administrator will pay such claims upon entry of orders allowing compensation.

The Plan also contemplates satisfaction of the outstanding balance due under the DIP Facility by crediting such balance against the Purchase Price (as defined in the Purchase Agreement), but with the adjustments provided for in Section 2.2 of the Purchase Price.  While the DIP Order authorizes the Debtors to draw up to $1.5 million under the DIP Note, the Debtors do not anticipate using the entire amount of the DIP Facility.  Further, the Purchase Agreement provides for the Purchase Price (as defined therein) to be reduced by the outstanding amounts due under the DIP Facility *plus* any increases in working capital from the Petition Date.

Finally, Article II.E provides for the Debtors to pay all statutory U.S. Trustee fees each quarter until the cases are converted, dismissed or closed.

**B.      Classes and Proposed Treatment**

The summaries below are intended to describe the classes of Claims and Interests provided for under the Plan.  Such summaries do not amend, modify or otherwise change the actual treatment provided in Article III of the Plan.  For the complete treatment provided under the Plan, creditors and interest holders should read the Plan, attached hereto as Exhibit A.

Other than with respect to distributions made pursuant to Article III.B.5(b)(ii) of the Plan, all distributions under the Plan will be made by the Plan Administrator, and all Claims will be satisfied, solely from the Plan Escrow.  The Plan provides for such distributions to be made as soon as possible after the Effective Date and no later than the Distribution Date, which is defined to be 90 days after the Effective Date of the Plan.[3]

Finally, the Plan is proposed by all ten Debtors.  Thus, in theory, each Debtor has its own classes of Claim and Interest Holders.  As set forth in Article III.E of the Plan, however, any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

---

[3] As set forth in the Definition of "Distribution Date," if a Claim or Interest has not been allowed by the Distribution Date, then the Distribution Date for that particular Claim or Interest will be 14 days after entry of a Final Order allowing such Claim or Interest, or as otherwise agreed to in writing by the Plan Administrator.

| Class | Claims and Interests | Summary of Treatment[4] |
|---|---|---|
| 1 | **Other Priority Claims**<br>Estimated Number of Holders: 0<br>Estimated Amount of Claims: $0.00<br>Status: Unimpaired<br>Voting: No – Deemed to Accept<br>**Estimated Recovery: 100%** | At the option of the Plan Administrator, either payment in full in cash of such Holder's Allowed Other Priority Claim, or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. |
| 2 | **AR Revolver Agreement Claims**<br>Estimated Number of Holders: 1 (Third Coast)<br>Estimated Amount of Claims: $700,000.00[5]<br>Status: Unimpaired<br>Voting: No – Deemed to Accept<br>**Estimated Recovery: 100%** | At the option of the Plan Administrator, Third Coast Bank (or its permitted assigns) will receive either payment in Cash in full satisfaction of the Allowed AR Revolver Agreement Claim, or such other treatment rendering such Holder's Allowed AR Revolver Agreement Claim Unimpaired. However, if any portion of the AR Revolver Agreement Claim is held to be unsecured pursuant to section 506(a) of the Bankruptcy Code, then such unsecured portion shall be treated as a General Unsecured Claim under Class 6 below. |
| 3 | **HD Smith Secured Claim**<br>Estimated Number of Holders:  1 (HD Smith)<br>Estimated Amount of Claims:  $4,130,000.00<br>Status:  Impaired<br>Voting: Yes<br>**Estimated Recovery:  67.6%** | In full satisfaction of the HD Smith Secured Claim, HD Smith (or its permitted assigns) will receive pro rata shares of the HD Smith Secured Cash Payment $2,792,361.00. |
| 4 | **Other Secured Claims**<br>Estimated Number of Holders: None Known<br>Estimated Amount of Claims: $0.00<br>Status: Unimpaired<br>Voting: No – Presumed to Accept<br>**Estimated Recovery: 100%** | At the option of the Plan Administrator, either payment in full in cash of such Holder's Allowed Other Secured Claim, or such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired. |

---

[4] In all instances described in this Disclosure Statement, the treatment proposed is in intended to be in full satisfaction of the applicable Claims and Interests.  Further, such treatment is without prejudice to a Claim or Interest Holder's agreement to receive treatment on terms that is less favorable than the treatment proposed for other members of the same class.

[5] The Debtors anticipate paying most, if not all, of the AR Revolver Agreement Claim amount pursuant to the DIP Order from collection of Third Coast's collateral during the course of the cases.  All remaining amounts, if any, as of the Effective Date will be treated pursuant to Article III.B.2 of the Plan.

| Class | Claims and Interests | Summary of Treatment[4] |
|-------|---------------------|------------------------|
| 5 | **General Unsecured Trade Claims**<br>Estimated Number of Holders: 60<br>Estimated Amount of Claims: $1.1 million<br>Status:  Unimpaired<br>Voting:  No – Deemed to Accept<br>**Estimated Recovery: 100%** | For Claims arising (based on the original invoice dates) more than 90 days before the Petition Date, the Plan Administrator will make payment in full in Cash (from the Plan Escrow), or provide such other treatment rendering such Holder's Allowed General Unsecured Trade Claim Unimpaired.<br><br>For Claims arising (based on the original invoice dates) 90 days or less before the Petition Date, the Reorganized Assured will make payment in full in Cash out of its own funds (i.e., not out of the Plan Escrow) in the ordinary course of business after the Effective Date, or provide such other treatment rendering such Holder's Allowed General Unsecured Trade Claim Unimpaired. |
| 6 | **Other General Unsecured Claims**<br>Estimated Number of Holders: 10-15<br>Estimated Amount of Claims: $3.15 million<br>Status:  Unimpaired<br>Voting:  No – Deemed to Accept<br>**Estimated Recovery: 100%** | Except to the extent that a Holder of an Allowed Other General Unsecured Claim agrees to a less favorable treatment of its Allowed Other General Unsecured Claim, each such Holder thereof shall receive payment in full in Cash. |
| 7 | **Preferred Stock – Series D**<br>Estimated Number of Holders: 7<br>Estimated Shares Outstanding: 2,429[6]<br>Estimated Amount of Claims: $2,548,303<br>Status:  Impaired<br>Voting:  Yes<br>**Average Estimated Recovery: 85%**<br>**Estimated share price: $.4495 (fully diluted)** | All shares of Series D Preferred Stock will be cancelled on the Effective Date.  Unless a Holder agrees to less favorable treatment, such Holder will receive the Series D Preferred Cash Distribution ($2,183,836) will be distributed ratably to Series D Preferred Stock holders.   This is approximately $.4495 per share of Series D Preferred Stock (as fully diluted Common Stock), but may be more for certain holders, if other Series D Preferred Stock holders agree to receive less than their Pro Rata Share of the Series D Preferred Cash Distribution.   In addition, Holders of Series D Preferred Stock may receive pro rata distributions from the "Remaining Proceeds" (i.e., potential excess Sale Proceeds after Class 9 Series B Preferred Stock Holders receive their "Maximum Series B Distribution" of $.23 per share).[7] |

---

[6] As fully diluted, this would be approximately 4,858,800 shares of Common Stock.
[7] The Debtors do not anticipate that the Sale Proceeds will be sufficient to make the Maximum Series B Distribution.  Thus, it is not likely that Series D Preferred Stock Holders will receive further distributions from the Remaining Proceeds.

| Class | Claims and Interests | Summary of Treatment[4] |
|---|---|---|
| 8 | **Preferred Stock – Series A & C**<br>Estimated Number of Holders: 4<br>Estimated Shares Outstanding: 2,279[8]<br>Estimated Amount of Claims: $2,278,000.00<br>Status: Impaired<br>Voting: Yes<br>**Estimated Recovery: 23%**<br>**Estimated share price:$.23 (fully diluted)** | All shares of Series A Preferred Stock and Series C Preferred Stock will be cancelled on the Effective Date. Unless a Holder agrees to less favorable treatment, such Holder of Series A or Series C Preferred Stock as of the Distribution Record Date will receive pro rata distributions from the Series A&C Preferred Cash Distribution, which will be $582,310.00, or approximately $.23 per share of Series A and Series C Preferred Stock, as fully diluted Common Stock. |
| 9 | **Preferred Stock – Series B**<br>Estimated Number of Holders: 10<br>Estimated Shares Outstanding: 5,124[9]<br>Estimated Amount of Claims: $5,199,000.00<br>Status: Impaired<br>Voting: Yes<br>**Estimated Recovery: Unknown**<br>**Est. share price: $.5 - $.13 (fully diluted)** | All shares of Series B Preferred Stock will be cancelled on the Effective Date. Unless a Holder agrees to less favorable treatment, such Holder of Series B Preferred Stock as of the Distribution Record Date will receive pro rata shares of the excess Sale Proceeds, if any, remaining after making distributions to Holders of Claims and Interests in Classes 1 through 8, and after payment of reasonable compensation and expenses to the Plan Administrator for fulfilling its Plan obligations. Under no circumstances may such distributions exceed $.23 per share of Series B Preferred Stock, as fully diluted Common Stock (the "Maximum Series B Distribution"). If the Maximum Series B Distribution is made, any Remaining Proceeds will be distributed ratably to Series D Preferred Stock Holders. |
| 10 | **Intercompany Claims**<br>Estimated Number of Holders: Unknown<br>Estimated Amount of Claims: Unknown<br>Status: Impaired<br>Voting: No – Deemed to Reject<br>**Estimated Recovery: 0%** | At the option of the Reorganized Debtors, all Intercompany Claims will be cancelled without any distribution on such Claims, or reinstated as of the Effective Date. |
| 11 | **Interests in the Subsidiary Debtors**<br>Estimated Number of Holders: 1 (Assured)<br>Status: Impaired<br>Voting: No – Deemed to Reject<br>**Estimated Recovery: 0%** | Assured owns 100% of the equity Interests in all Subsidiaries. Under the Plan, Intercompany Interests will be cancelled and not receive any distribution. Notwithstanding the foregoing, Reorganized Assured will have the option to maintain the equity ownership of any Reorganized Debtor by any other Reorganized Debtor. |

---

[8] As fully diluted, this would be approximately 2.5 million shares of Common Stock.
[9] As fully diluted, this would be approximately 5.8 million shares of Common Stock.

| Class | Claims and Interests | Summary of Treatment[4] |
|---|---|---|
| 12 | **Subordinated Claims**<br>Estimated Number of Holders: None Known<br>Estimated Amount of Claims: $0.00<br>Status: Impaired<br>Voting: No – Deemed to Reject<br>**Estimated Recovery: 0%** | Unless the Holder of an Allowed Class 12 Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Class 12 Claim, each such Holder thereof shall receive a Pro Rata share of any Sale Proceeds remaining after payment of all Allowed Claims to which the Allowed Class 12 Claim has been subordinated. |
| 13 | **Other Interests in Assured**<br>Estimated Number of Holders: Unknown<br>Status: Impaired<br>Voting: No – Deemed to Reject<br>**Estimated Recovery: 0%** | Other Interest means all other equity securities in Assured Pharmacy, Inc., other than the Preferred Stock classified in Classes 7, 8 and 9, including Common Stock, warrants, options and other Interests. All such Other Interests will be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect. Because the Debtors do not anticipate the Sale Proceeds will be sufficient to pay the Preferred Stock in full, there will be no distributions under the Plan to Holders of Other Interests. |

## VI.   Means of Implementation of the Plan

### A.   Vesting of Assets (The Reorganized Debtors vs. the Plan Administrator)

It is imperative to the successful rehabilitation of the Debtors and their operations to maintain business as usual to the fullest extent possible.   To achieve that goal, the Plan contemplates maintaining the Assured entities, but issuing new equity interests in Assured to the Purchaser and its assigns under the Purchase Agreement.   The Reorganized Debtors will then be able to operate under the existing licenses without interruption to their businesses and operations. On the other hand, the Plan will establish a Plan Escrow to receive the Sale Proceeds, and will further appoint the Plan Administrator to administer all Claims and Interests asserted in the Bankruptcy Cases.   This process will ensure that the Reorganized Debtors can exit bankruptcy with their assets and operations free and clear of such Claims, except as expressly provided in the Plan.   To implement this concept, the Debtors and the Purchaser have negotiated the Purchase Agreement, which is attached to the Plan as an exhibit, and which will be executed by the Debtors and the Purchaser on the Effective Date of the Plan.

### B.   The Purchase Agreement

The Purchase Agreement is the definitive agreement under which the Purchaser has agreed to pay or cause to be paid the aggregate amount of $11.5 million cash (subject to adjustments) to the Debtors on the Effective Date in exchange for 100% of the newly issued equity securities in the Reorganized Debtor. The newly issued securities will be unregistered pursuant to an exemption from registration under the Securities Act.   The specific terms of the Purchase Agreement cover the details of the transaction, such as the calculation of the purchase price, the transition of ownership and management, maintenance of contracts and licenses in the Reorganized Debtors' names, identification of assets and other ordinary terms.   The Reorganized

Debtors will maintain the same licenses as existed before the Petition Date, and the Debtors' legal entities and tax identification numbers will not change.

## C.    Management of the Reorganized Debtors Under the Plan; Plan Administrator

Under the Purchase Agreement, all of the Debtors' current officers and directors will resign from their respective positions.  The Purchaser or its designee(s) will be entitled to all newly issued equity securities in the Reorganized Debtors and, on or before the Effective Date, the Purchaser will execute or cause to be executed the New Governance Documents, which will be filed as Plan Supplements at least 10 days before the Voting Deadline.  Such Plan Supplements will further disclose, among other things: (i) the new officers and directors; and (ii) any other information required to satisfy the 1129(a)(5) disclosure requirements. Subject to such further disclosures, the Debtors anticipate that Robert DelVecchio, Brett Cormier and Mike Schneidereit will continue to be employed by the Reorganized Debtors, as the Chief Pharmacy Development Officer, Vice President of Pharmacy Finance and Vice President of Pharmacy Operations, respectively.  The terms of compensation for such individuals are disclosed more fully in the Form of Employment Agreement and the Form of Executive Unit Grant Agreement, which are disclosed here by reference to Exhibits C and D respectively to the Purchase Agreement.

In addition to the continued employment of Messrs. DelVecchio, Cormier and Scheidereit under new employment agreements, the Debtors have promised closing incentives to eleven (11) of its non-insider employees to ensure these critical employees' continued support through the closing of the transaction with the Purchaser.  The specific amounts promised are listed in the Purchase Agreement, but total $74,000 in the aggregate, ranging from $1,000.00 to $13,000 per employee.    To be clear, these incentive payments will only become due to such non-insider employees if the employees are still employed with the Debtors on the Effective Date of the Plan and consummation of the Purchase Agreement.  Under the Plan and Purchase Agreement, the Plan Administrator will pay such amounts from the Plan Escrow, as closing costs, under Article IV.C of the Plan.

The initial composition of Reorganized Assured's board will include David Lowenberg, Matthew Clary, Christoper Graber and Gary Mecklenburg, none of whom are insiders of the Debtors.

The Plan Supplement will further disclose the identity of the Plan Administrator and the terms of compensation provided to such individual or individuals, along with their affirmation to be bound by the terms of the Plan.

## D.    Executory Contracts and Unexpired Leases

To the extent the Purchase Agreement and any schedules or exhibits thereto do not provide a list of the contracts and leases to be assumed thereunder, the Purchaser will file a final list of the leases and executory contracts to be assumed by the Debtors and assigned to the Reorganized Debtors under the Plan no later than 10 days before the Voting Deadline.  Any Cure Claims of assumed contracts/leases will be paid in full pursuant to the terms of the Plan out of the Plan Escrow, unless the non-debtor contract counterparties agree to alternative treatment. Rejection damage claims are discussed in Article V of the Plan.

On the Effective Date, and to the extent permitted by applicable law, every executory contract and unexpired lease shall be rejected, *unless* such executory contract or unexpired lease: (a) has been assumed pursuant to an order of the Bankruptcy Court; (b) is identified in the Plan, a Plan Supplement or the Confirmation Order to be assumed; or (c) is the subject of a pending motion to assume filed on or before the Confirmation Hearing.  For the avoidance of doubt, the Debtors will assume all licenses and the same will be assigned to the Reorganized Debtors.  However, unless expressly designated for assumption in a Plan Supplement, the Debtors will reject all of the Debtors' pre-petition internal agreements, bylaws, warrants, debentures, regulations or agreements, and such agreements shall be replaced by the New Governance Documents to be executed on or before the Effective Date.

### E.    Powers of the Plan Administrator

It will be the Plan Administrator's responsibility for administering all Claims and disbursing all Sale Proceeds held in the Plan Escrow.  The Plan provides that the Plan Administrator is entitled to reasonable compensation, and that the Plan Administrator may retain and compensate such professionals as it deems necessary to fulfill its obligations under the Plan.  However, in the interest of maximizing recoveries for all parties in interest, the Plan requires such compensation and expenses to be paid first from unclaimed funds or funds that would otherwise have been distributed but were withheld because the individual checks were too small to issue.  See Article VI.D & F of the Plan.

### F.    Administration of Claims and the Plan Administrator

Except for the Claims treated under Article III.B.5(b)(ii) (certain General Unsecured Trade Claims that were 90 days or few past due as of the Petition Date), the Plan Administrator will have the sole power, discretion and authority to object to and settle all Claims and Interests, as is in the best interest of the post-confirmation Estates.  For those Claims described above, the Plan Administrator must consult with the Reorganized Debtor and obtain its written consent before objecting to or settling such Claims.  The reason for such consultation is that the Reorganized Debtors are responsible for distributions under the Plan to trade creditors with accounts payable that were less than 90 days old as of the Petition Date.  While the Debtors do not anticipate many claim objections, such rights are expressly reserved in Article VII of the Plan.

### G.    Estate Causes of Action

Unless expressly reserved, all Avoidance Actions are released under the Plan.  This is done because the Debtors are providing 100% recoveries to their creditors and, thus, do not believe there is any value in pursuing preference or fraudulent transfer claims.  Such proposed releases, however, do not take effect unless and until the Plan is confirmed, and becomes effective.

**ANY CLAIMS, COUNTERCLAIMS, CAUSES OF ACTION AND DEFENSES THAT ARE EXPRESSLY RESERVED UNDER THE PLAN WILL BE ASSIGNED TO THE REORGANIZED DEBTORS, UNLESS OTHERWISE PROVIDED UNDER THE PLAN.**

### H.      Releases under the Plan

As set forth more fully in Article VII.C of the Plan,[10] the Debtors are proposing to release certain "Released Parties," which is defined to include the Debtors, the Reorganized Debtors, the estates, the Purchaser and their respective affiliates, agents, and assigns, from any and all claims whatsoever based on or relating to, among other things, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of claims and interests prior to or during the Bankruptcy Cases, any agreements to support the Plan, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Purchase Agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, but expressly excluding claims for fraud, willful misconduct or gross negligence.

Likewise, the Plan provides for certain Holders of Claims and Interests to provide similar releases to the Debtors, the Reorganized Debtors, and their Estates and the same non-debtor "Released Parties."  Such releases will include any and all claims whatsoever arising from the Debtors, the Debtors' restructuring, the Chapter 11 Cases,  the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of claims and interests prior to or in the Chapter 11 Cases, any agreements to support the Plan, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Purchase Agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence.

The Debtors believe such releases are justified given the 100% payment provided under the Plan by and through the Sale Proceeds derived under the Purchase Agreement.  Nevertheless, if any parties wish to opt-out of such releases, the ballots submitted to holders entitled to vote on this Plan will contain a box to check where such Claim or Interest Holders may expressly opt-out and retain any claims they may otherwise assert against such non-debtor third parties, to the extent such claims exist.

### I.      Discharge of Debts and Injunctions

The Plan and Confirmation Order will act as a discharge of debts owed by the Debtors and a permanent injunction against all parties in interest from pursuing claims and causes of action against the Debtors and the Reorganized Debtors beyond the relief expressly provided in the Plan and Confirmation Order.  **THIS MEANS THAT ALL CLAIMS, RIGHTS AND REMEDIES THAT A CREDITOR OR OTHER PARTY IN INTEREST COULD HAVE ASSERTED AGAINST THE DEBTORS OR DERIVATIVELY THROUGH THE DEBTORS WILL BE DISCHARGED, AND SUCH CREDITORS OR INTERESTED PARTIES WILL BE ENJOINED FROM PURSUING SUCH REMEDIES PROVIDED THAT THE DEBTORS AND REORGANIZED DEBTORS SATISFY THE**

---

[10] The summaries provided herein do not modify in any way the releases proposed under the Plan.  They are shortened here to provide a summary of the terms of the plan.

OBLIGATIONS IMPOSED ON THEM UNDER THE PLAN AND CONFIRMATION ORDER.

The specific provisions of the Plan governing such discharge and injunction may be found in Article VIII.F (for the Reorganized Debtors) and Article VIII.G (for the Purchaser) of the Plan.

## VII.    Voting Procedures

### A.    Deadline for Submission of Ballots and Objections to Confirmation

On _____, the Bankruptcy Court entered an order pursuant to section 1125 of the Bankruptcy Code (the "Solicitation Order") approving this Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor, typical of the solicited holders of Claims against and Interests in the Debtors, to make an informed judgment with respect to the acceptance or rejection of the Plan. A copy of the Solicitation Order is included in the materials accompanying this Disclosure Statement.   APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR MERITS OF THE PLAN.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of, or against, the Plan on the enclosed ballot and returning the same to the address set forth on the ballot, so that it will be received by the Balloting Agent, no later than 4:00 p.m., Central Time, on [_____, 2015] (the "Voting Deadline").

If you do not vote to accept the Plan, or if you are the holder of an Unimpaired Claim or Interest, you may be bound by the Plan if it is accepted by the requisite number of Claimants and amount of Claims.

TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE RECEIVED NO LATER THAN 4:00 P.M., CENTRAL TIME, ON [_____, 2015].  For detailed voting instructions, you may contact counsel for the Debtors at the address and number provided on the cover of this Disclosure Statement.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing"), on [_____, 2015, at _____.m.], Central Time, in the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division.

The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before [_____.m., on _____, 2015].

### B.    Creditors Solicited to Vote

Each Creditor holding a Claim in Classes 3 and 7-10, each of which are impaired under the Plan, is being solicited to vote on the Plan.  Interests classified in Class 11 (Intercompany

Interests) and Class 13 (Other Interests) are also impaired under the Plan, but because such Holders will receive nothing under the Plan, they are deemed to reject the Plan, and will not be entitled to vote.  Holders of Claims in Classes 1, 2, 4, 5 and 6 are unimpaired and, thus, deemed to accept the Plan.  Creditors and Interest Holders will receive Ballots for each Class in which they are entitled to vote.

A Creditor's vote will <u>not</u> be counted if there is an objection to such Creditor's Claim, unless and to the extent that the Bankruptcy Court temporarily allows the Claim.  To obtain temporary allowance of a Claim for voting purposes, a Creditor must file a Rule 3018 Motion before the Voting Deadline.  Such motion must be heard and determined by the Bankruptcy Court prior to the date and time established by the Bankruptcy Court for determination of confirmation of the Plan.  In addition, a Creditor's vote may be disregarded if the Bankruptcy Court determines that the Creditor's acceptance or rejection of the Plan was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Debtors support confirmation and urge all Claimants to vote to accept the Plan.

## VIII.   <u>EXPLANATION OF CHAPTER 11</u>

### A.     Overview of Chapter 11

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor in property as of the date the petition is filed.  Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee.  In the present Chapter 11 Case, the Debtors are in possession of their Estates and assets as debtors-in-possession.

The filing of a chapter 11 petition also triggers the automatic stay provisions of the Bankruptcy Code.  Section 362 of the Bankruptcy Code provides, *inter alia,* for an automatic stay of all attempts to collect pre-petition claims from the debtor or otherwise interfere with its property or business.  Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed plan for the Debtor.

The formulation of a plan is the principal purpose of a chapter 11 case.  The plan sets forth the means for satisfying the claims against and interests in the debtor.  Because a trustee was appointed in this case, any party in interest may propose its own plan.

### B.     Plan of Reorganization

A chapter 11 plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the debtor's assets.

Generally, after a plan of reorganization has been filed, the holders of claims against or interests in a debtor are permitted to vote to accept or reject the plan.  Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.  This

Disclosure Statement is presented to holders of Claims against and Interests in the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code.

If all classes of claims and interests accept a plan of reorganization, the bankruptcy court may nonetheless still not confirm the plan unless the court independently determines that the requirements of section 1129 of the Bankruptcy Code have been satisfied. Section 1129 sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interest" test and be "feasible." The "best interests" test generally requires that the value of the consideration to be distributed to the holders of claims and interests under a plan may not be less than those parties would receive if the debtor were liquidated pursuant to a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code. Under the "feasibility" requirement, the court generally must find that there is a reasonable probability that the debtor will be able to meet its obligations under its plan without the need for further financial reorganization.

**The Debtors believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code, including, in particular, the "best interests of creditors" test and the "feasibility" requirement.**

**THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE TO ACCEPT THE PLAN.**

## C.   Confirmation Requirements

Chapter 11 does not require that each holder of a claim against or interest in a debtor vote in favor of a plan of reorganization for the bankruptcy court to confirm the plan. At a minimum, however, the plan must be accepted by a majority in number and two-thirds in amount of those claims actually voting in at least one class of impaired claims under the plan. The Bankruptcy Code also defines acceptance of the plan by a class of interests (equity securities) as acceptance by holders of two-thirds of the number of shares actually voting. In the present case, only the holders of Claims who actually vote will be counted as either accepting or rejecting the Plan.

In addition, classes of claims or interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or interests in an impaired class. A class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or interests of that class are modified in any way under the plan. However, if holders of the claims or interests in a class do not receive or retain any property on account of such claims or interests, then each such holder is deemed to have voted to reject the plan and does not actually cast a vote to accept or reject the plan.

Classes 3 and 7-13 are impaired under the Plan. Because Classes 11 and 13 Interest holders receive nothing under the Plan, they are deemed to reject the Plan and are not entitled to vote. All other claimants are entitled to vote on the Plan. To be clear, the Debtors will solicit votes from holders of claims classified in Classes 3 and 7-10.

The Bankruptcy Court may also confirm a plan of reorganization even though fewer than all the classes of impaired claims and interests accept it. For a plan of reorganization to be

confirmed despite its rejection by a class of impaired claims or interests, the proponents of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or interests that has not accepted the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class of rejecting claims if, among other things, the plan provides:  (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and interests, that the holder of any claim or interest that is junior to the claims or interests of such class will not receive or retain on account of such junior claim or interest any property at all unless the senior class is paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims, and (b) no senior class of claims is to receive more than 100% of the amount of the claims in such class.

The Debtors believe that the Plan has been structured so that it will satisfy these requirements as to any rejecting Class of Claims or Interests, and can therefore be confirmed, if necessary, over the rejection of such Classes.  The Debtors, however, reserve the right to request confirmation of the Plan under the "cramdown" provisions of section 1129 of the Bankruptcy Code.

## IX.    Alternatives to Confirmation

The Debtors have evaluated alternatives to the Plan, including the liquidation of the Debtors through a chapter 7 case.  After studying the alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize creditors' recoveries.  The following discussion provides a summary of the Debtors' analysis leading to their conclusion that the Plan and the Purchase Agreement with the Purchaser will provide the highest and best return for creditors and shareholders.

## A.    Potential Liquidation Scenarios

To date, the Debtors have not received offers from interested buyers or investors that would provide the same capital and cash that the Purchaser's offer would provide.  Thus, absent a higher or better offer, if the Plan is not confirmed, and the Purchase Agreement with the Purchaser is not consummated, the Debtors will have to consider liquidating their businesses through chapter 7 of the Bankruptcy Code.  In a chapter 7 liquidation, the chapter 7 trustee will likely cease the Debtors' operations, collect any outstanding accounts receivable (generally, for a fraction of their face value), and dispose of the remaining inventory on hand.  As discussed above, the Debtors' inventory is highly regulated and cannot be sold through ordinary means, if at all.  Thus, it is more likely that the trustee will abandon the unsold inventory, and allow suppliers to reclaim, or allow the DIP Lender to attempt to sell it under non-bankruptcy law.  As shown in the chart below, such a liquidation scenario would not provide enough cash to pay unsecured creditors anything close to the 100% payment proposed under the Plan.

| Asset (Face Value) | Face Value | Low Range (10%) | Mid Range(25%) | High Range(65%) |
|---|---|---|---|---|
| Cash on hand | $5,000 | $5,000 | $5,000 | $5,000 |
| Accounts Receivable | 1,100,000 | 110,000 | 275,000 | 715,000 |
| Inventory | 225,000 | 22,500 | 56,250 | 146,250 |
| Fixed Assets | 70,000 | 7,000 | 17,500 | 52,500 |
| Prepaid assets[11] | 368,000 | - | - | - |
| Permits/Licenses[12] | Unknown | - | - | - |
| Litigation Rights | Unknown | - | - | - |
| **Gross Assets** | | 144,500.00 | 353,750.00 | 918,750.00 |
| *Less Trustee Fee* | | (10,475.00) | (20,938.00) | (49,188.00) |
| **Net Potential Distributable Cash** | | **$134,025.00** | **$332,812.00** | **$869,562.00** |

As apparent from the foregoing analysis, the likely distributable cash from a chapter 7 liquidation would not be sufficient to satisfy the secured claims of Third Coast (approximately $700,000) and HD Smith (approximately $4.13 million). In the best case scenario above, HD Smith (and maybe Third Coast) would be left with a significant deficiency claim, which would have to be paid in addition to the $1.1 million in trade debt, $620,000 in deferred salaries, $1.9 million in convertible debenture debt and approximately $1.2 million in other general unsecured claims. The only source that the chapter 7 trustee would have available to pay those claims would be through litigation. **This means that the chapter 7 trustee would have to analyze potential claw-back litigation such as preference and fraudulent transfer actions against third-party vendors and insiders. Under the proposed Plan, such actions will not be pursued because Holders of General Unsecured Claims will receive full payment in satisfaction of their Claims, and the Debtors' trade vendors are necessary to the successful rehabilitation of the Debtors' business.**

While the foregoing analysis is not perfect, it illustrates that the proposed transaction with the Purchaser offers a far superior alternative than liquidation through chapter 7. Accordingly, the proposed Plan passes the best interest of creditors test.

**B.      Effect of Confirmation on Taxes**

**THE PLAN AND ITS RELATED TAX CONSEQUENCES HAVE THE POTENTIAL TO BE COMPLEX. THERE MAY BE STATE, LOCAL OR OTHER TAX CONSIDERATIONS APPLICABLE TO EACH CREDITOR. CREDITORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE CONSEQUENCES OF THE PLAN TO THEM UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND OTHER TAX LAWS. NOTHING IN THIS DISCLOSURE STATEMENT OR IN THE PLAN IS MEANT TO PROVIDE ANY TAX ADVICE TO ANY CREDITOR OR PARTY IN INTEREST.**

## X.      Conclusion

Based on the foregoing analysis, the Debtors believe that their Plan proposes the best alternative for creditors. For those reasons, the Debtors urge creditors entitled to vote on the

---

[11] On belief, most of the pre-paid assets will be non-refundable in a liquidation scenario.

[12] On belief, the Debtors' rights in their permits, licenses and provider numbers are not transferrable and, thus, have little or no liquidation value.

Plan to **ACCEPT** the Plan and to evidence such acceptance by returning their ballots so that they will be received on or before [__**:00 p.m., Central Time, on** _____**, 2015**].

*[Remainder of this page intentionally left blank; signature page to follow]*

DATED:  March 5, 2015

Respectfully Submitted,

**COX SMITH MATTHEWS INCORPORATED**

1201 Elm Street, Suite 3300
Dallas, Texas  75270
(214) 698-7800
(214) 698-7899 (Fax)

By: _____*/s/ Aaron M. Kaufman*_____
    George H. Tarpley (gtarpley@coxsmith.com)
    State Bar No. 19648000
    Aaron M. Kaufman (akaufman@coxsmith.com)
    State Bar No. 24060067

**COUNSEL THE DEBTORS AND DEBTORS IN POSSESSION**