**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| **In re:** § <br> § <br> **ASSURED PHARMACY, INC.** § <br> § <br>          Debtor. § § § | **CHAPTER 11 CASE** <br><br> **CASE NO. 15-40389** <br> **(Joint Administration Pending)** |
| **In re:** § § <br> **ASSURED PHARMACY MANAGEMENT,** § <br> **INC.** § § <br>          Debtor. § | **CHAPTER 11 CASE** <br><br> **CASE NO. 15-40399** |
| **In re:** § § <br> **ASSURED PHARMACY DALLAS, INC.** § § <br>          Debtor. § | **CHAPTER 11 CASE** <br><br> **CASE NO. 15-40391** |
| **In re:** § § <br> **ASSURED PHARMACY GRESHAM, INC.** § § <br>          Debtor. § | **CHAPTER 11 CASE** <br><br> **CASE NO. 15-40393** |
| **In re:** § § <br> **ASSURED PHARMACY KANSAS, INC.** § § <br>          Debtor. § | **CHAPTER 11 CASE** <br><br> **CASE NO. 15-40394** |
| **In re:** § § <br> **ASSURED PHARMACIES, INC.** § § <br>          Debtor. § | **CHAPTER 11 CASE** <br><br> **CASE NO. 15-40395** |
| **In re:** § § <br> **ASSURED PHARMACY NORTHWEST, INC.** § § <br>          Debtor. § | **CHAPTER 11 CASE** <br><br> **CASE NO. 15-40397** |
| **In re:** § § <br> **ASSURED PHARMACY BOSTON, INC.** § § <br>          Debtor. § | **CHAPTER 11 CASE** <br><br> **CASE NO. 15-40390** |

| In re: | § | CHAPTER 11 CASE |
| --- | --- | --- |
| **ASSURED PHARMACY DENVER, INC.** | § § § | CASE NO. 15-40392 |
| Debtor. | § | |
| In re: | § | CHAPTER 11 CASE |
| **CS COMPLIANCE GROUP, INC.** | § § § | CASE NO. 15-40398 |
| Debtor. | § | |

**DECLARATION OF BRETT CORMIER
IN SUPPORT OF FIRST-DAY MOTIONS**

**THE STATE OF TEXAS** §
§
**COUNTY OF COLLIN** §

On this day personally appeared Brett Cormier, and, pursuant to 28 U.S.C § 1746, attested to the following:

1. "My name is Brett Cormier. I am over the age of eighteen years of age, and am fully competent to make this Declaration. I have never been convicted of a felony.

2. I am the Vice President and Chief Financial Officer of Assured Pharmacy, Inc. ("Assured") and have held these positions since 2008. I am also the Treasurer of certain subsidiaries of Assured and oversee the management of Assured's and its subsidiaries' books and records. For purposes of this Declaration, I will describe Assured and all of the subsidiary debtor entities[1] collectively as the "Debtors." I have personal knowledge of the facts stated herein or such facts are based on my review of the Debtors' operations, including the Debtors' books and records, and based on my day-to-day participation in the management of the Debtors' operations.

---

[1] The subsidiaries comprise Assured Pharmacy Management, Inc., Assured Pharmacy Dallas, Inc., Assured Pharmacy Gresham, Inc., Assured Pharmacy Kansas, Inc., Assured Pharmacies, Inc., Assured Pharmacy Northwest, Inc., Assured Pharmacy Boston, Inc., Assured Pharmacy Denver, Inc. and CS Compliance Group, Inc. (collectively, the "Subsidiaries").

**DECLARATION OF BRETT CORMIER IN SUPPORT OF FIRST DAY MOTIONS - PAGE 2 OF 19**

3.  I have over 20 years of accounting, finance and operations experience in public and private company settings. I previously held senior level finance and accounting positions with Monarch Dental Corporation, First Broadcasting, Sleep Holdings, Holigan Investment Group and Pharmerica, Inc. I began my professional career in 2004 as a staff accountant for Jani-King International, a commercial cleaning franchisor. I received a Bachelor of Business Administration Degree with a major in Finance in 1993 from the University of Texas at Arlington and I am Certified Public Accountant in the State of Texas. Because of my position with the Debtors, I am familiar with the operating histories of the Debtors and I am also familiar with their financial condition and am personally familiar with the facts set forth below.

4.  Assured was first organized as a Nevada corporation on October 22, 1999, under the name of Surforama.com. It later changed its name to eRXSYS, Inc. and subsequently to Assured Pharmacy, Inc. in October 2005.

5.  Since May 2003, Assured has been engaged in the business of establishing and operating pharmacies that specialize in highly regulated pain medication for chronic pain management. Because its focus is on dispensing medication, Assured typically does not keep in inventory non-prescription drugs, or health and beauty related products, such as walking canes, bandages and shampoo. The company's revenue is derived primarily from sale of prescription medications, the majority of which comes from repeat customers.

6.  Assured's pharmacies maintain a variety of regulated drug categories, known as Schedule II, Schedule III and Schedule IV drugs. Schedule II drugs are considered narcotics by the United States Drug Enforcement Administration ("DEA"), and are the most addictive, hence they are highly regulated by the DEA and are required to be segregated and

secured in a separate cabinet. Schedule III and Schedule IV drugs are less addictive and are less regulated. Because Assured's business model focuses on servicing pain management physicians and their patients with chronic pain, Assured strives to maintain larger amounts of Schedule II drugs than most retail pharmacies.

7. The Debtors' business goals were to develop a national footprint as a premier provider of pharmacy services to physicians and patients primarily in the treatment of chronic pain. Management of the Debtors developed and refined what we believed to be a unique pharmacy service model for chronic pain physicians and patients that is capable of being scaled into a national chain. The Debtors intended to scale their business by opening up to four additional pharmacies per year for a total of 12 pharmacies as the initial platform for the national expansion, subject to their ability to secure the requisite financing. However, since Assured's inception, the Debtors have struggled to obtain the financial capital to achieve the growth and scale necessary to realize the capabilities of the Debtors' business model. Thus, beginning approximately in August 2013, management developed and implemented a plan to scale back operations until operations and financing were such that the company could take advantage of its unique model and expansion goals.

8. Currently, the Debtors operate three pharmacies—in Kirkland, Washington; Leawood, Kansas; Greenwood Village, Colorado. Previously, the Debtors also operated pharmacies in Riverside, California and Gresham, Oregon, but, management decided to close those pharmacies in August 2013, to preserve the Debtors' going concern until they could secure sufficient capital to fund the Debtors' plans for expansion.

9. The Debtors have attempted to restructure their books by making operational reductions to their staff, scaling down operations, and negotiating directly with their vendors

and key creditors. Those efforts have proven helpful, but were still not enough to enable the Debtors to operate profitably. Even with scaled down operations, the Debtors still required new sources of capital to meet their ordinary operating needs.

10. In July, 2014, management was approached by affiliates and capital advisors of Precise Analytical, LLC (the "Purchaser") regarding a potential transaction that would provide the Debtors with the capital necessary to expand the Debtors' business to meet their business model and expansion goals.

11. The potential transaction is in the best interest of the Debtors and their creditors and shareholders. Without a transaction or alternative capital, the Debtors would not be able to continue operations. In the weeks immediately preceding the Petition Date, the Debtors received a number of extensions of trade creditor and/or bridge loans from existing creditors, including HD Smith and Hillair Capital, to pay ordinary operating expenses and additional legal costs to prepare for these bankruptcy cases. Without additional loans and investments from time to time, the Debtors would have run out of cash, making a transaction less attractive and valuable for the Debtors' creditors and shareholders.

12. Management for the Debtors believed that the Purchaser offered a unique opportunity for the Debtors for two main reasons. First, the Purchaser is a toxicology company that provides the Debtors with a strategic advantage in the market place. With the Purchaser's support, the Debtors will be able to offer their customers an end to end solution in toxicology and pharmacology. This offering does not currently exist in the market place. Second, the Purchaser's management has vast experience in the pharmacy space. That knowledge is very important because the Purchaser's management already understands the Debtors' operational needs, thereby shortening the integration period of the two companies.

Thus, the Debtors entered into an exclusivity agreement with the Purchaser in October, 2014, and created a data room to allow the Purchaser to conduct due diligence of the Debtors. Ultimately, the Debtors have negotiated a transaction, subject to approval of this Court pursuant to the plan filed contemporaneously herewith, under which all old equity securities in Assured will be cancelled, and the Purchaser or its assigns will acquire all of the new equity securities of Assured. The Debtors will be able to use the proceeds from this transaction to pay administrative costs, claims and make distributions to Assured's existing owners. With the agreements we were able to negotiate with certain key constituents pre-petition, we believe the plan will pay creditors 100% of their claims, with the potential for distributions to be made to common stock holders.

13. Before the Petition Date, the Debtors contacted their key creditors and shareholders to negotiate terms of payment based on an anticipated sale of Assured's equity securities to the Purchaser. The Debtors also circulated plan support agreements to certain creditors and shareholders to determine what terms would be acceptable to such parties to ensure that the Sale Proceeds could be distributed in a fair and equitable manner that, in turn, would allow the proposed transaction to go forward with the support of key creditor and preferred stockholder groups. These support agreements generally provide that the creditors will support the Plan as long as the Plan treats the supporting creditors' Claims and Interests on terms consistent with the agreements.

14. No other solicitation materials have been circulated to creditors prior to the Bankruptcy Court's approval of this disclosure statement. As set forth herein, the Plan provides for 100% payment of general unsecured claims. The plan support agreements generally relate to the Preferred Stock holders' claims or interests that would be next in

priority, although some of the holders of Preferred Stock also hold Secured Claims, Unsecured Claims and Common Stock. With these plan support agreements, absent unusual circumstances, the Debtors anticipate that all Classes of Claims and Interests that are impaired under the Plan and entitled to vote will accept the Plan by very significant margins, as the parties to the plan support agreements include the vast majority in dollar terms of the Preferred Stock interest and claims. It is not anticipated that any funds will be available to make distributions on account of Common Stock. All Equity Interests (including Preferred Stock, Common Stock and Other Interest) will be cancelled under the Plan.

15. With the support of the Purchaser and the Debtors' key creditors and Preferred Stock holders, the Debtors believe that this transaction can be consummated through the Plan, and the Plan Administrator will be able to make the distributions which were negotiated pre-petition. Management for the Debtors has spent a great deal of time negotiating with the Purchaser and the Debtors' key creditors and shareholders to ensure that the plan distributions are fair and equitable, and that the plan process may be quick and consensual among the Debtors' key constituents. Likewise, the Purchaser has expended a significant amount of time and expense conducting its own due diligence and preparing to close the transaction contemplated in these Cases. These negotiations have been true third party, arm's length discussions. Subject to this Court's approval, the Purchaser has also agreed to advance up to $1,500,000.00 to the Debtors, as post-petition debtor-in-possession financing, which will be repaid from the Debtors' post-petition working capital and as a credit against the proposed $11.5 million purchase price.

16. The DIP financing and the proposed plan were negotiated as a package. Thus, as discussed below, the Purchaser has requested—and the Debtors are seeking approval of—

a transaction termination fee to be allowed as an administrative expense and paid in the event that the Debtors elect not to consummate the plan presently proposed or the transaction is terminated because of defaults by the Debtor, all as more specifically set forth in the DIP Note that is to memorialize the DIP financing. The proposed termination fee is approximately 4% of the proposed purchase price. Given the amount of time and expense the Purchaser has spent negotiating with the Debtors on the proposed transaction and the costs incurred by them through their attorneys, advisors and consultants over the past seven months during which this transaction has been in negotiations, I believe the transaction termination fee is reasonable. As noted in the proposed order approving the DIP financing, this transaction termination fee is payable only if the Debtors decide not to consummate the proposed transaction with the Purchaser or if the Debtors have defaulted in such a manner that the Purchaser determines not to go forward with the transaction. We have requested that this termination fee be approved in connection with the *Motion For Interim and Final Authority to Use Cash Collateral, Obtain Debtor in Possession Financing, and Determining Adequate Protection, Superpriority Claims and Liens* ("DIP Financing Motion"), which is discussed further below.

B.    *Assets and Liabilities*

17.    A brief description of the estimated assets and liabilities of the Debtors, as of the Petition Date, is described below. It is important to note that the parent company, Assured Pharmacy, Inc., is a publicly traded company that files financial statements regularly with the Securities and Exchange Commission. Historically, Assured has filed such statements on a consolidated basis with its Subsidiaries. In other words, the Debtors historically disclose the value of their assets without detailing which entity owns the particular assets. The same is true for liabilities. For purposes of this first-day declaration,

I will follow this pattern by describing the Debtors' assets and liabilities, on a consolidated basis, as they have been disclosed historically. The Debtors reserve the right to list some of these assets and liabilities within the particular Subsidiaries in the bankruptcy cases where they belong, upon further due diligence, if appropriate. However, because of the nature of how the plan is being proposed, with all sale proceeds to be paid to the parent Assured, and creditors to be paid in full, regardless of the entity against whom they assert claims, we have described the Debtors' assets and liabilities here, on a consolidated basis, for simplicity:

    a)     Assets (estimated values as of the Petition Date):

        (i)     Gross cash on hand: $5,000.00

        (ii)     Gross accounts receivables: $1,100,000.00[2]

        (iii)     Inventories: $225,000.00

        (iv)     Prepaid assets: $368,000.00[3]

        (v)     Personalty and equipment: $70,000.00[4]

        (vi)     Licenses: Unknown[5]

        (vii)     Litigation and Causes of Action: Unknown

    b)     Liabilities (estimated values as of the Petition Date):

        (i)     Secured debt owed to Third Coast Bank (Factor): $700,000.00

        (ii)     Secured debt owed to H.D. Smith (major supplier): $4,130,000.00[6]

        (iii)     Convertible Debentures: $1,900,000.00

        (iv)     Trade debt: $1,100,000.00

---

[2] Includes the face amount of such receivables. Actual collections may be lower.

[3] Includes pre-paid financing costs, stock-based compensation, insurance premiums and vendor deposits.

[4] The amount reflected above is the book value, after depreciation. The Debtors believe that the liquidation value of such personalty and equipment would be substantially less (maybe $35,000), and that the replacement value would be substantially more (at least $150,000).

[5] On belief, the licenses held by the Debtors are not transferable and, thus, have no independent value.

[6] HD Smith also holds shares of Preferred Stock and provided pre-petition vendor trade credit, which are included in the liabilities listed in subparagraphs (v) and (vii).

  (v)  Other unsecured debt: $1,200,000.00

  (vi)  Deferred Salaries: $620,000.00

  (vii)  Obligations to Preferred Stockholders: $10,025,000.00[7]

  (viii)  Common Stock: Unknown[8]

C. *Goal of the Bankruptcy Cases and Proposed Plan of Reorganization*

  18. The Debtors' goal in these bankruptcy cases is to continue operating their pharmacies without interruption, and to transition ownership of Assured's and its related businesses to the Purchaser under a consensual plan so that the Debtors' secured and unsecured creditors are paid in full, a substantial percentage distribution is made to the preferred stockholders and the possibility exists for a distribution to holders of the common stock of Assured. To achieve this goal, we have filed the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") and disclosure statement, along with the proposed Equity Purchase Agreement, as an exhibit to the Plan.

  19. Because the Debtors' cash flow has struggled in the months leading up to the Petition Date, time is of the essence to consummate the transaction with the Purchaser and avoid incurring administrative bankruptcy expenses to the greatest extent possible. Moreover, the terms of the Equity Purchase Agreement require the Debtors to move quickly

---

[7] According to the applicable certificates of designation filed with the Securities and Exchange Commission, Preferred Stock holders are entitled to liquidation preferences in the following order of preference: Series D, Series A & C (pari passu), and Series B. As of the Petition Date, there were issued and outstanding: (i) 2,429 shares of Series D Preferred Stock (convertible to 4,858,800 shares of Common Stock); (ii) 1,466 shares of Series A Preferred Stock (convertible to 1,629,006 shares of Common Stock); (iii) 813 shares of Series C Preferred Stock (convertible to 902,778 shares of Common Stock); and (iv) 5,124 shares of Series B Preferred Stock (convertible to 5,693,333 shares of Common Stock).

[8] Assured is registered with the Securities and Exchange Commission under File Number 001-35735, and its Common Stock is traded on the over the counter market under stock symbol APHY. As of the Petition Date, there were 13,353,294 shares of Common Stock issued and outstanding. The average share price for the Common Stock has been approximately $.1857 per share for the past year, with prices trading as high as $.24-.25 per share in late November, 2014, and as low as $.04 - $.10 per share in January, 2015 and the week ending February 27, 2015.

to obtain confirmation within a brief period of the Petition Date.  To that end, the Debtors have agreed to seek confirmation of the Plan on a rapid (though, not expedited) timeline.

20.    As discussed further below, the Plan and disclosure statement were filed on the Petition Date, and the Debtors are seeking to abbreviate the confirmation schedule slightly.  Approval within such timelines is a condition upon which the Purchaser has agreed to advance funds under the DIP Note (discussed below).  Then, the Debtor has agreed to use their best efforts to obtain confirmation of the Plan within 30 days after the disclosure statement is approved.  This means that the Plan should be confirmed within 60 days of the Petition Date.  As discussed below, because the proposed transaction and resulting proceed distribution have been discussed and negotiated with most of the key creditors and preferred stockholders in advance of the Petition Date, the Debtors believe an expedited and abbreviated confirmation time frame is warranted.  Otherwise, the Debtors risk interruption in service to customers and administrative expenses are likely to be higher.  Under the circumstances, as discussed below, the Debtors would prefer to exit bankruptcy as soon as practicable to ensure their continued operations and ability to continue servicing their customers without interruption.

D.    *First Day Motions*

21.    To ensure the quick and timely consummation of the transaction with the Purchaser, in addition to filing the Plan and disclosure statement on the Petition Date, we have also filed a number of so-called first-day motions (the "First-Day Motions"), as more fully discussed below:

22.    **Joint Administration.**  The substantial number of creditors and other parties in interest (particularly the large number of common stockholders) involved in the Debtors' intended chapter 11 cases may impose heavy administrative and other burdens upon the court

and the office of the Clerk of the Court. I believe that joint administration of the Debtors' cases will facilitate the coordinated administration of their cases. Furthermore, I understand that joint administration of the Debtors' cases is appropriate because the Debtors intend to file with this Court numerous motions and applications to effect a smooth process for the business during the bankruptcy and a rapid exit via a confirmed plan. As such, the joint administration of these cases, including the combining of notices to creditors of the respective estates, as well as the notices and hearings of all matters at the same time, including, without limitation, motions and adversary proceedings, will promote the economical, efficient and convenient administration of the Debtors' estates. With multiple Debtors, each with its own case docket, the failure to jointly administer these cases would result in duplicative pleadings repeatedly being filed. I believe that such duplication of substantially identical documents would be wasteful and would unnecessarily burden the Clerk of the Court.

23. **Complex Case Designation.** We have filed a *Motion for Designation as Complex Chapter 11 Bankruptcy Cases*, which I understand from my counsel is in accordance with the General Orders of the Court when commencing the contemplated cases. I believe this motion is warranted because (a) Assured's common stock is publicly traded; (b) there are over 100 creditors and shareholders that would be parties in interest in these cases; and (c) the total debt in these cases is approximately $18-20 million, before considering the discounts we negotiated pre-petition. Based on these factors, I believe the Debtors are entitled to complex chapter 11 case treatment of their cases, which will allow Assured and its bankruptcy counsel to use a limited service list, pre-schedule hearings for the next two months while the confirmation process is ongoing, and set hearings on a more frequent basis.

I believe such treatment will help the Debtors complete the contemplated reorganization in an effective and efficient manner without incurring unnecessary administrative costs.

24. **Cash Collateral and Post-Petition Financing.** We have also filed a motion to approve post-petition financing and to use cash collateral. The terms of that motion are described below:

a) Under the financing motion, the Debtors propose to borrow funds from the Purchaser, as the DIP Lender, on an interim and final basis, as necessary to pay for post-petition operations, including payroll, purchases of new inventory and other administrative costs. Under the terms of the loan agreement, absent an event of default, the DIP Lender will be paid monthly interest during the case, a $30,000 up-front fee on the funds available under the facility, and the balance will be credited against the purchase price under the equity purchase agreement (with certain adjustments to be made for any increase or decrease in the Debtors' working capital during the course of these Bankruptcy Cases).

b) As security for the DIP loan, the Debtors propose to grant the DIP Lender a superpriority administrative claim for advances made and first priority priming liens on all of the Debtors' assets, except chapter 5 causes of action and also excluding any pre-petition accounts receivables factored by Third Coast Bank. Subject to the preceding sentence, to the extent any of the collateral defined in the DIP Note is not already encumbered, the Purchaser will also receive a first priority lien on such collateral under the proposed DIP Note and order.

c) It is also imperative that the Debtors be allowed to use the receipts from collection of pre-petition accounts receivable to pay off their pre-petition factor, Third Coast Bank SSB ("Third Coast"). As set forth below, the Debtors no longer intend to factor their accounts receivable generated post-petition, but they do anticipate the post-petition collection of factored accounts receivable generated pre-petition in the approximate amount of $350,000 - $450,000 within the first 30 days of the bankruptcy cases. While HD Smith has liens junior to Third Coast, and the Debtors intend to obtain post-petition financing that may impact Third Coast's rights, the Debtors believe that HD Smith consents to the proposed use of cash collateral, and that Third Coast is adequately protected by the proposed post-petition collection and remission of the accounts receivable as proposed in this motion. By the motion, the Debtors seek a determination that no additional adequate protection for Third Coast is required, and that the Debtors may collect and remit such accounts to Third Coast to the extent of the lesser amount between the collectible accounts receivable in existence on the Petition Date, or Third Coast's pre-petition secured claim.

d) Finally, the Debtors are proposing to approve a Transaction Termination Fee in the amount of $460,000.00 in favor of the Purchaser, to be allowed as an administrative expense and paid in the event that the Debtors terminate

their efforts to seek confirmation of the plan and approval of the equity purchase agreement with the Purchaser or if the Debtors default on their obligations under the Equity Purchase Agreement and the Purchaser determines to terminate the sale transaction.  As discussed above, the Purchaser has expended a great deal of time conducting due diligence and preparing to consummate the equity purchase agreement and otherwise preparing for these bankruptcy filings during the past eight months.  If the Debtors determine that it is in the estates' best interest to explore alternative transactions, they may do so, provided that they pay the Purchaser the Transaction Termination Fee, which will compensate the Purchaser for its time and expense, and avoid further litigation with the Purchaser over such termination.  This amount is approximately 4% of the purchase price proposed by the Purchaser.  If other parties are interested in a similar transaction with the Debtors, I do not believe a fee of this amount will discourage such interested parties from making a higher or better offer to the Debtors.  Accordingly, I believe the Transaction Termination Fee proposed in the DIP motion is warranted and fair to all concerned, and all other relief proposed under the DIP motion, including the post-petition loans, use of cash collateral pursuant to a budget, and granting of liens and other adequate protection, should be approved on an interim basis and, upon final hearing, a final basis.

25. **Employee Salaries/Benefits.**  We are also seeking, as part of our first day relief, approval of certain compensation and benefits for employees.  The Debtors will need to retain and pay their employees.  At the time of the filing of the bankruptcy petition, the Debtors had approximately 22 employees, collectively.  Of these employees, six are employed at the Debtors' corporate headquarters and 16 are employed at the Debtors' three operating pharmacies.  The continued operation by the Debtors as it undergoes reorganization is essential to maintain business as usual, especially given the already reduced staff.  Additionally, there are certain administrative functions which are critical and must be preserved.  For example, the Debtors' financial staff is essential to managing the Debtors' day-to-day operations while coordinating with the Purchaser and the Debtors' bankruptcy counsel to address pressing matters relevant to these bankruptcy cases.  Without employees, the Debtors' ability to verify and pay vendors, maintain appropriate insurance policies, monitor operations and fulfill numerous other duties that are essential in operating licensed pharmacies could not be fulfilled.  The result, if the employees were simply to leave the

Debtors, would be chaos. I have reviewed the facts stated in the benefits motion and agree that they are true and correct. In short, the Debtors must fund their payroll obligations to ensure that the Debtors' employees are paid timely without a gap, or the Debtors may lose key employees who cannot be replaced without significant disruptions to the Debtors' post-petition operations. To this end, the Debtors must also be allowed to honor their benefits and payroll obligations, such as accrued vacation and sick leave, healthcare and workers' compensation premiums, and application of all withholding obligations. We believe this relief is particularly appropriate given that the Plan and sale transaction discussed therein provides for payment in full of such claims and all unsecured claims.

26. **Bank Accounts Motion.** We have also filed a motion to authorize the Debtors to continue using its existing bank accounts. As discussed in greater detail in that motion, the Debtors have two bank accounts at Third Coast (with whom the Debtors factor their accounts receivable), which is not an authorized depository under the U.S. Trustee's guidelines, and five other accounts held at either PlainsCapital Bank or Wells Fargo Bank (both of which are authorized depositories under the UST guidelines). I have been advised that upon the filing of these bankruptcy cases, the ordinary procedure is to close all preexisting bank accounts at unauthorized depositories and reopen new debtor-in-possession bank accounts at authorized depositories. This is not a viable option for the Debtors. The Debtors' customers have existing automated payment instructions that remit their payments on pre- and post-petition accounts receivable to the pre-existing Third Coast bank accounts. If the Debtors were required to close those accounts, we would likely experience a significant cash flow disruption that would be extremely critical to the operations of the Debtors, while we waited for our customers to begin making payments to a new address.

Rather than risking such a cash flow crisis, we proposed to maintain the Third Coast accounts, pay down the Third Coast secured/factored claim as described in the DIP financing motion and related budget, and then move any excess funds into a Debtor-in-Possession account held at one of the Debtors' other depository accounts held at PlainsCapital Bank or Wells Fargo Bank, both authorized depositories. Additionally, we have requested the ability to instruct our banks which payments made around the Petition Date may be honored because they are post-petition payments. Given the complexity of these cases and the risk of any disruption to the Debtors' cash flow, we believe the relief requested in this Motion is warranted, as it will avoid unnecessary delay in post-petition payments to employees, critical suppliers and other vendors that are absolutely necessary to maintain the value of the Debtors' operations.

27. **Confirmation Scheduling Motion.** Finally, we have filed a motion asking the Court to abbreviate the period for obtaining approval of the disclosure statement, soliciting votes for or against the plan, and setting the confirmation hearing on an expedited basis. In all, we are asking for a hearing on the disclosure statement within 15 days of the Petition Date, and a confirmation within 15 days thereafter. We believe such an abbreviated schedule is warranted given the pre-petition plan support agreements received compared to the potential impact a lengthier bankruptcy could have on the Debtors' customers.

    a)    A complete list of the supporting creditors is below:

        (i)    HD Smith

        (ii)    Pinewood Trading Fund

        (iii)    Sageborne, LLC

        (iv)    Mosaic Private Equity Fund, LP

        (v)    Mosaic Financial Services, LLC

      (vi)    A. Brown

      (vii)    M. Huang

      (viii)    L. Alexander

      (ix)    Stratcon Partners

      (x)    Robert DelVecchio

      (xi)    Brockington Securities

      (xii)    Hillair Capital Investments, LP

      (xiii)    D. Siwicki

    b)    Based on the foregoing agreements, absent any unusual circumstances, the Debtors are likely to have sufficient support from the following impaired classes to gain acceptance:

      (i)    Class 3 – HD Smith Secured Claim

      (ii)    Class 7 – Series D Preferred Stock

      (iii)    Class 8 – Series A & C Preferred Stock

      (iv)    Class 9 – Series B Preferred Stock

    c)    Because the Plan, Purchase Agreement and DIP Note are all part of a "packaged deal" with the Purchaser, and because a consummated transaction is critical to the 100% recovery for the Debtors' creditors, the Debtors desire an expedited closing to limit the risk of potential interruption in service to the Debtors' customers. As discussed above, the Debtors' repeat customers are critical to the Reorganized Debtors' future success. If customers are unable to rely on the Debtors for service, even for a short time, they may not return as customers in the future. For that reason, to maintain the Debtors' going concern value, and given the substantial support the Plan will have from its creditor body, we believe a slightly abbreviated confirmation schedule is warranted.

## II.    <u>CONCLUSION</u>

28.    As detailed in this Declaration, the most sensitive and complex tasks required for a successful reorganization of the Debtors have been accomplished in advance of the commencement of these chapter 11 cases. However, there are a number of first-day matters that must be addressed to get the Debtors and their creditors from "Point A" (the pre-

negotiated plan) to "Point B" (the confirmed and effective plan). I believe the relief we have requested in our First-Day Motions is appropriate to achieve those goals, and that the circumstances weigh heavily in favor of scheduling hearings on the First-Day Motions immediately, setting a hearing to consider the Disclosure Statement within 15 days or less of the Petition Date, setting a Confirmation Hearing date within 15 days thereafter, or the earliest date convenient to this Court after the expiration of the applicable notice periods, and granting such other relief as the circumstances may require to help the Debtors achieve a successful reorganization in these cases.

[Remainder of this page intentionally left blank; signature to follow]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, on this 4th day of March, 2015.

_____
Brett Cormier